MCGRAIL & BENSINGER LLP
676A Ninth Avenue #211
New York, New York  10036
(718) 434-2676
(718) 228-7717 Facsimile
Menachem M. Bensinger (MB 3467)

*Counsel to Abraham Poznanski*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| SOVEREIGN ASSETS LTD., | ) | Bankr. Case No.: 14-13009 (SCC) |
| | ) | |
| | ) | |
| | ) | |
| Debtor in Foreign Proceeding | ) | |
| | ) | |

**ABRAHAM POZNANSKI'S OPPOSITION TO (I) RECOGNITION OF CHAPTER 15
PROCEEDING AND (II) MOTION FOR PRELIMINARY INJUNCTION**

Abraham Poznanski  ("**Poznanski**"), by his undersigned counsel, hereby files this

opposition (the "**Opposition**") to (i) *Verified Petition Under Chapter 15 of the Bankruptcy Code*

*for Recognition of a Foreign Main Proceeding* filed on October 31, 2014 [ECF Doc. No. 1] (the

"**Petition**") and (ii) *Ex Parte Motion of Petitioners Foreign Representatives Seeking (1)*

*Provisional Relief for a Preliminary Injunction and (2) Order to Show Cause and Temporary*

*Restraining Order* filed on October 31, 2014 [ECF Doc. No. 5] (the "**PI Motion**") and, in

support thereof, respectfully states as follows:

**PRELIMINARY STATEMENT**

1.       The Petition and its accompanying injunctive relief papers are strikingly

similar to what a complaint against Abraham Poznanski might resemble.  This is no coincidence;

in fact, that is their *exact* nature.  Although cloaked in the sheep's clothing of a request for

1

comity with respect to another country's insolvency regime, in reality, the Petition, together with the historical litigation by "the company" against Poznanski discussed therein, reflects a longstanding two-party dispute initiated by two non-U.S. citizens (Edwin Cohen and Danny Turetsky ("**Cohen & Turetsky**")), who are playing fast and loose with New York courts (state and federal), bouncing from one to another (and to Israel) as they win or lose. Using the Israeli courts to litigate against Poznanski in direct violation of a New York Supreme Court stay order, and then furthering that stay violation litigation by commencing an involuntary liquidation in Israel, they have contravened "manifest" United States public policy. The Court should deny the Petition on this ground.

2.      Additionally, since Sovereign Assets Ltd., the Israeli shell company in liquidation in Israel ("**SAL**"), has no operations and carries out no regular economic activity in Israel (as Petitioners acknowledge in their Petition), the Israeli proceeding is neither a foreign main nor a foreign non-main proceeding. In all events, the Court should deny the Petition.

3.      Finally, there are absolutely no grounds for the Court to further the injunctive relief temporarily and consensually awarded to the foreign representatives who, as shown below, are Cohen & Turetsky's prepetition counsel and are most certainly doing their bidding. Cohen & Turetsky *twice* sought the exact same injunctive relief they now seek from this Court from Judge Melvin Schweitzer in the New York Supreme Court, Commercial Division, and, both times, after considering the merits and Poznanski's opposition, he flatly refused to grant the same. In asking this Court for the same relief, including on an *ex parte* basis, Cohen & Turetsky failed to inform the Court that it was their *third* request for same and that the first two requests were denied. This deception is yet a further reason why the Court should deny recognition, and certainly deny any injunctive relief.

2

## RELEVANT BACKGROUND

4.      In or around December 2006, Poznanski, a dual U.S./Israeli citizen, purchased approximately seventy percent (70%) of the shares of Israeli public company SAL for approximately $9 million ($3 million in 2006 and the balance in 2007), with the intent of causing SAL to invest in U.S. real estate. Aff. of Abraham Poznanski filed herewith (the "**Poznanski Aff.**"), at ¶ 2.  SAL thereafter, through various U.S. wholly and partially owned subsidiaries (SOVA Merritt LLC, a Delaware limited liability company, and 401 Church Street LLC, a Tennessee limited liability company), acquired two pieces of valuable real estate, one in Tennessee and one in Connecticut. Id.  Additionally, SAL raised approximately $12.5 million dollars through a single bond issuance in Israel. Id.  On information and belief, as of the petition date, Cohen & Turetsky owned and controlled more than fifty percent of these bonds.

5.      In or around April 2008, Poznanski sold one-half of his shares in SAL to Cohen & Turetsky, who held their shares through an offshore investment vehicle called Almond Investments Luxembourg S.A.R.L ("**Almond**"). Id. at ¶ 3.  The parties then entered into that certain Shareholders' Agreement dated as of April 10, 2008 (the "**Shareholders' Agreement**") governing their relationship, a copy of which is attached hereto as **Exhibit A**. Id.  Section 7.8 of the Shareholders' Agreement includes an ADR provision that requires the parties to arbitrate any dispute with respect to their ownership of SAL before a rabbi, who would act as the sole arbitrator of such dispute. Id.  The Shareholders' Agreement also provides that Poznanski would control SAL's assets unless his ownership of SAL dropped below a certain threshold. Id.  From December 2006 until October 31, 2014 (the date the Court entered the *ex parte* TRO), Poznanski has been solely responsible for managing all of SAL's U.S. assets. Id.

6.      During the past few years, the relationship between Poznanski and his partners, Cohen & Turetsky, severely eroded. Id. at ¶ 4.  The parties asserted many claims and

crossclaims against each other and, ultimately, Cohen & Turetsky commenced litigation in New York Supreme Court, Commercial Division. Id.

The State Court Action

7.    On March 26, 2012, Cohen & Turetsky initiated Sova Merritt LLC, v. Abraham Poznanski and Wells Fargo Bank, National Association, before Judge Melvin Schweitzer, New York Supreme Court, Commercial Division (the "**State Court Action**"), via summons and complaint, a copy of which is attached hereto as **Exhibit B**.  They also filed on such date an Order to Show Cause with supporting papers, copies of which are attached hereto as **Exhibit C**,[1] in which they asked Judge Schweitzer to grant them the *identical* injunctive relief they now seek in this Court (i.e. control of the company while they litigate).  They made this request on notice to Poznanski, and he opposed the requested TRO, a copy of which is attached hereto as **Exhibit D**.[2]

8.    On April 6, 2012, Judge Schweitzer issued an Order (the "**April 6 Order**"), a copy of which is attached hereto as **Exhibit E**, in which he denied the injunctive relief sought by Cohen & Turetsky since, as set forth in section 7.8 of the Shareholders' Agreement, "[there is] an arbitration provision in Israel and that has to take precedence in this context for the control issue." See Tr. of April 5, 2012 Hr'g before Judge Schweitzer (the "**April Transcript**"), a copy of which is attached hereto as **Exhibit F**.

9.    Rather than comply with Judge Schweitzer's order to submit to arbitration,

---

[1] Exhibits C, D, G, and H to this Opposition are the relevant documents filed with respect to the two state-court injunction motions, but are not all the pleadings and exhibits filed by the parties with respect to same, which are voluminous.  Poznanski will provide any documents from the state court litigation that the Court requests to see.

[2] Poznanski also filed an answer and counterclaims, a copy of which is attached hereto as **Exhibit M**.

Cohen & Turetsky promptly commenced litigation in Israel (this time derivatively, using the Israeli parent company SAL as the plaintiff) on or around May 5, 2012 (the "**Stay Violation Litigation**"), in which they sought (again) essentially the same relief against Poznanski (i.e., control of the company) as they had already sought before Judge Schweitzer. See Petition at ¶ 62.

10.    On or about September 12, 2012, Poznanski filed a separate action in the Tel Aviv District Court (the "**Stay Enforcement Action**") to compel arbitration between him and Cohen & Turetsky in accordance with Judge Schweitzer's directive. Poznanski Aff. at ¶ 5. Cohen & Turetsky opposed this motion.

11.    Ignoring Judge Schweitzer's stay of litigation, the Israeli court issued a decision in the Stay Violation Litigation on or around June 17, 2012. Petition at ¶ 64.  Thereafter, Cohen & Turetsky used that Stay Violation Litigation as a basis for bringing several contempt and other motions against Poznanski in the Israeli district court, see Petition at pp. 15-16, and, on November 7, 2012, they filed a second order to show cause before Judge Schweitzer, a copy of which is attached hereto as **Exhibit G**, in which, again, they sought injunctive relief against Poznanski (i.e., control of the company while they litigate) and for permission to amend their complaint.  Like their first order to show cause, this order to show cause was filed on notice and, like the first order to show cause, Poznanski opposed it.  A copy of Poznanski's opposition to the second order to show cause is attached hereto as **Exhibit H**.

12.    On November 19, 2012, two years ago, Judge Schweitzer held a hearing on the second order to show cause.  A copy of the transcript from that hearing is attached hereto as **Exhibit I** (the "**November Transcript**").  Judge Schweitzer expressed dismay that Cohen & Turetsky had disobeyed his previous stay of litigation and chosen to commence and prosecute

the Stay Violation Litigation in Israel. <u>See November Transcript</u> at ¶ 3. He therefore denied the relief sought by Cohen & Turetsky in their second order to show cause. <u>See November Transcript</u>. He also ruled that (i) the Israeli court, which had agreed to decide matters against Poznanski rather than require the parties to arbitrate their disputes, "ha[d] it all wrong" and (ii) that there is a binding arbitration provision between Cohen & Turetsky and Poznanski which "this country" would enforce in lieu of requiring or permitting a litigation. <u>Id</u>. at pp. 3-4.

13.    On November 20, 2012, Judge Schweitzer issued an order (the "**November 20 Order**"), a copy of which is attached hereto as **Exhibit J**, in which he reaffirmed his ruling at the prior day's hearing by (again) staying the action pending a ruling on arbitration in Israel.

14.    On November 21, 2012, the day after Judge Schweitzer issued the November 20 Order that (again) stayed Cohen & Turetsky's litigation against Poznanski, Cohen & Turetsky filed a pleading in their Stay Violation Litigation in which they argued that the Israeli court *should not* stay the Israeli litigation, even though Judge Schweitzer had just issued his stay. A copy of that pleading (in Hebrew) is attached hereto as **Exhibit K**.[3]

15.    On or about March 17, 2013, the Israeli court issued an order in the Stay Enforcement Action, in which it granted in part and denied in part Poznanski's motion, finding that certain parties (Almond/Poznanski) were compelled to participate in ADR but that other parties (Cohen & Turetsky) were not so required. <u>Poznanski Aff</u>. at ¶ 6. Rather than returning to Judge Schweitzer at that time for his determination as to whether he would remove his stay, Cohen & Turetsky decided that their chances of success were higher if they simply continued their litigation against Poznanski outside of the New York court system; yet again, they

continued litigating against Poznanski in Israel, in direct violation of Judge Schweitzer's stay. See, e.g., Petition at pp. 15-16 (discussing the litigation carried out by Cohen & Turetsky while Judge Schweitzer's stay was in place).

16.    On or about March 17, 2014, SAL's bond trustee and Edwin Cohen (through his counsel Mr. Kogan) commenced an involuntary liquidation proceeding against SAL in the Israeli Tel Aviv district court. Petition at ¶ 80.  This was, of course, yet another way of attempting to gain control over the company, even though Judge Schweitzer had previously, repeatedly, and unequivocally stayed Cohen & Turetsky's attempts to do so.

17.    On October 31, 2014, Edwin Cohen's lawyer Rami Kogan, appointed by the Israeli court as one of two liquidators of SAL, filed the Petition and accompanying papers in which, for a third time, he seeks control of the company during litigation, the exact same interim relief that his client have now twice (unsuccessfully) sought against Poznanski from Judge Schweitzer, as well as in Israel.[4]  This time, though, Cohen & Turetsky were crafty: they filed it *ex parte* and neglected to tell this Court that they had already sought the relief twice before, and failed to receive it twice before.[5]  Without that information or Poznanski presenting his defense, the Court granted temporary injunctive relief.

Cohen & Turetsky's Past and Current Relationship With Guy Gissin and Rami Kogan

---

[3] Poznanski is having the pleading translated and will provide an English version to the Court and all parties as soon as the translator completes its work.

[4] In case there is any doubt as to whether the relief Cohen & Turetsky sought before Judge Schweitzer (through a derivative suit) is the same relief they are seeking from this court (through a foreign liquidation and chapter 15), attached as **Exhibit N** is a chart that shows each substantive allegation made in the Petition and accompanying papers and its corresponding location in the papers filed before Judge Schweitzer.

[5] At the time that they filed their *ex parte* papers, counsel to the Foreign Representatives was in material settlement discussions with state court counsel to Poznanski, and could, therefore, have easily have informed him of the motion for a TRO.

18.     It is crucial for the Court to note when considering positions taken by the foreign representatives that neither of them is a neutral third party.  To wit, Rami Kogan, one of the two Israeli-court appointed liquidators and a foreign representative before this Court, was and, upon information and belief, is, private counsel to Edwin Cohen. Poznanski Aff. at ¶ 7. Guy Gissin, the second Israeli-court appointed liquidator and a foreign representative before this Court, was and, upon information and belief, is counsel to the Company's bondholders. Id. Edwin Cohen was and, upon information and belief, is one of the Company's largest outstanding bondholders of record,[6] holding approximately 52% of SAL's debt. Id. Upon information and belief, under Israeli law a bondholder is prohibited from voting its bonds if it is also a controlling shareholder in the debtor. Id. Against this backdrop, Cohen & Turetsky divested themselves of indirect ownership of SAL on November 28, 2012 (see Petition, ¶ 76) allowing them to vote a majority of the bonds and thereby direct the bondholder's counsel.  See email from Danny Turetsky to Guy Gissin, Edwin [Cohen], and others, dated November 28, 2012, a copy of which is attached hereto as **Exhibit L** (stating "I can therefore confirm that the genuine sale of my shares was transacted and I expect to be included in the vote.").  Thus, as of the petition date in this Court, both Israeli liquidators and foreign representatives have attorney-client relationships with Cohen & Turetsky.

## **ARGUMENT**

### I.     **Recognizing the Israeli Proceeding Is Adverse to Manifest U.S. Public Policy**

19.     Bankruptcy Code section 1506 provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be

---

[6] Ownership of these bonds is the subject of another litigation among the parties with respect to a separate joint venture agreement among them, styled Poznanski v. Turetsky and Cohen (N.Y. Supreme, No. 652449/2013).

manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. A court may, therefore, "refuse to grant main or non-main recognition if it would be manifestly contrary to United States public policy." In re Fairfield Sentry Ltd., 2011 U.S. Dist. LEXIS 105770 (S.D.N.Y. Sept. 15, 2011) (citing In re Gold & Honey, 410 B.R. 357 (Bankr. E.D.N.Y. 2009)).

20.     When considering relief sought by a foreign representative under Chapter 15, "deference [to the foreign proceeding] should be withheld where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of the United States." In re Rede Energia S.A., 515 B.R. 69, 91 (Bankr. S.D.N.Y. 2014). Notwithstanding its narrow application, courts have denied relief sought under Chapter 15 pursuant to the public policy provisions of Section 1506 where appropriate. See, e.g., In re Toft, 453 B.R. 186, 201 (Bankr. S.D.N.Y. 2011); In re Gold & Honey, 410 B.R. 357 (Bankr. E.D.N.Y. 2009); Vitro, S.A.B. de C.V. v. ACP Master, Ltd. (In re Vitro, S.A.B. de C.V.), 473 B.R. 117, 133 (Bankr. N.D. Tex. 2012).

21.     Moreover, there is "a strong public policy in favor of enforcing forum selection clauses." Wachovia Bank Nat'l Ass'n v. Encap Golf Holdings, LLC, 690 F. Supp. 2d 311, 327 (S.D.N.Y. 2010) (internal citations and quotations omitted). As a result, "forum selection clauses…are regularly enforced." Novak v. Overture Servs., 309 F. Supp. 2d 446, 451 (E.D.N.Y. 2004) (citations omitted); see also Lange v. Hoskins, 2013 U.S. Dist. LEXIS 187181 (D. Neb. Mar. 5, 2013) (referencing the "strong federal public policy favoring arbitration"); Pivoris v. TCF Fin. Corp., 2007 U.S. Dist. LEXIS 90562 (N.D. Ill. Dec. 7, 2007) (stating that "arbitration clauses are valid and enforceable agreements to be viewed with favor as a matter of federal and public policy"); Shah v. Monpat Constr., Inc., 65 A.D.3d 541, 543, 884 N.Y.S.2d 116, 119 (2d Dep't 2009) (stating that "arbitration is favored in New York State as a means of resolving disputes, and courts should interfere as little as possible with agreements to arbitrate.").

22.     Cohen & Turetsky have been, and are now, seeking control of the company and to prevent Poznanski from acting in his legal capacity as manager of its U.S. assets.  However, Judge Schweitzer ordered them to participate in arbitration in accordance with the Shareholder Agreement.  Thus, the entire basis of this proceeding is Cohen & Turetsky's end run around a stay imposed by a U.S. judge, carried out by litigating in an Israeli court that did not respect such stay, and then seeking approval of such litigation via this Chapter 15 petition.  As Judge Trust held in In re Gold & Honey, where he considered a Chapter 15 petition brought by Israeli Foreign Petitioners after they violated the automatic stay, this behavior is atrocious and warrants denial of recognition. See In re Gold & Honey, 410 B.R. at pp 368-369.

23.     The facts before Judge Trust in In re Gold & Honey are, in several crucial respects, identical to those here.  There, one of several related U.S. entities filed for Chapter 11 relief, thereby triggering the automatic stay with respect to all assets of its estate (including certain assets located in Israel). Id. at 363.  In direct and knowing opposition to that stay, a creditor of that entity and/or its stayed affiliates commenced Israeli litigation in violation of the stay, and the Israeli court chose to adjudicate on the merits notwithstanding the automatic stay. Id.  Then, after ignoring the stay and receiving relief (including being appointed estate receiver) in Israel, that foreign creditor returned to Judge Trust and asked for his blessing with respect to its Israeli litigation, via recognition under Chapter 15. See id. at 365.

24.     Judge Trust denied recognition under Chapter 15 because, amongst other things, such relief was contrary to manifest U.S. public policy.  He stated:

> [the Israeli creditor] proceeded in the Israeli Receivership Proceeding in spite of and in the face of this Court's Stay Order . . . . It would fly in the face of the Bankruptcy Code for this Court to recognize the [chapter 15 petitions] here and authorize the post-petition appointed Receivers to proceed in the United States when they were appointed as the result of a knowing and willful

violation of the stay. . . .

Id. at 368.

Thus, stated Judge Trust, "the Israeli Court made a decision to lift the automatic stay" imposed by operation of law and explicitly made applicable by his rulings. Id. at 369. In other words, the Israeli court, at the behest of those foreign petitioners, chose to overrule the United State's legal system. Cohen & Turetsky have done the same with respect to Judge Schweitzer's stay, ultimately concluding their Mideast crusade by filing the Petition before this Court.

25.    The similarities between the instant facts and those considered before Judge Trust don't end there. Here, Judge Schweitzer explicitly instructed the parties (orally and in his Orders denying a TRO) to proceed with *arbitration* and yet Cohen & Turetsky proceeded to *litigate* in Israel. Likewise, in Gold and Honey, "[the Israeli creditor] continued to prosecute the Israeli Receivership even after [Judge Trust]" explicitly ruled that the stay prevented that creditor from doing so. Id. at 368. As noted by Judge Schweitzer at the hearing on the Second Order to Show Cause, Cohen & Turetsky ignored his twice-given direction to arbitrate and caused their Israeli lawyers, one of whom is a foreign representative in this proceeding, to continue litigating in Israel.

26.    Judge Schweitzer stayed Cohen & Turetsky's efforts to grab control of the company to further "this county['s] policy in favor of enforcing arbitration agreements." November Transcript at p. 4 (stating that "an arbitration agreement, as we all know, takes precedence over a judicial proceeding in *this* country and in any event *we* enforce arbitration agreements." (emphasis added)). Not only did Cohen & Turetsky ignore this stay, but they even had the gall to seek identical injunctive relief in this Court on an *ex parte* basis, without disclosing its identical nature to the Court.

Considering that (i) the allegations between the State Court litigation and the Petition papers are,

essentially, identical, (ii) one of the two petitioners for liquidation in Israel is Edwin Cohen (of the infamous Cohen & Turetsky), and (iii) as detailed above, both foreign representatives also have an attorney-client relationship with Cohen & Turetsky,[7] there can be no doubt that the issues placed before the Court are really a two-party dispute that is both subject to an arbitration clause and prior rulings from a New York court.  This Court should not help foreign litigants steer around same. See generally Adkins v. Labor Ready, Inc., 303 F.3d 496, 500 (4th Cir. 2002) (internal citations and quotations omitted) (stating that, "Congress's view [is] that arbitration constitutes a more efficient dispute resolution process than litigation. Accordingly, due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration."); Hirschfeld Prods, INC. v. Mirvish, 218 A.D.2d 567, 569 (1995) (finding that "[a] party to a dispute governed by an arbitration agreement may not unilaterally evade the stipulated forum and litigate the controversy . . . In short, the courts will not permit a party to elevate form over substance to avoid an otherwise valid arbitration agreement governing the dispute.").

27.    In sum, should this Court choose to recognize the Israeli proceeding, it would (i) condone Cohen & Turetsky's disrespect for and disregard of the U.S. judicial system, (ii) encourage them, as well as other litigants in other matters, to view foreign courts as an appellate forum over U.S. courts, and (iii) trample on the fundamental Federal and New York dispute resolution policy in favor of requiring parties to an arbitration agreement to arbitrate their dispute.

28.    As should now be clear, Cohen & Turetsky have been using the U.S. legal

---

[7] The Foreign Representatives' ability to act impartially and not in furtherance of their clients' litigation goals highly questionable. See, e.g., In re Gold & Honey, 410 B.R. at 371 n.17

system to advance their alleged rights against a U.S. citizen, yet, when the U.S. court system rules against them, they simply ask the Israeli courts to ignore or overrule that U.S. court.  In fact, SAL's entire Chapter 15 proceeding is founded upon actions taken in an Israeli court by non-U.S. citizens in direct opposition to a stay issued by a U.S. court, which was itself implemented to protect the fundamental U.S. public policy of enforcing an arbitration provision in the face of a partnership dispute.

29.    For the above reasons, this case is "one of the rare cases in which an order of recognition on the terms requested would be manifestly contrary to U.S. public policy. . . .", In re Toft, 453 B.R. at 201, and the Court should deny recognition of the foreign proceeding as violating manifest U.S. public policy, rather than fall victim to  Cohen & Turetsky forum shopping tactics.

## II. Israel is not the Proposed Debtor's Center of Main Interests so There Can be No Foreign Main Proceeding

30.    Chapter 15 pertains to a case ancillary to a foreign proceeding that is "recognized" by the Court as either a "foreign main proceeding" or a "foreign nonmain proceeding."  See 11 U.S.C. § 1504; see also In re SPhinX, Ltd., 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) ("The first step to obtaining relief under chapter 15 is receiving 'recognition' of the foreign proceeding under Bankruptcy Code sections 1515 and 1517(a).").  The ultimate burden as to recognition is on the foreign representative.  See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122 (Bankr S.D.N.Y. 2007), aff'd, 389 B.R. 325, 335 (citation omitted).

31.    If the requirements of a foreign main proceeding or a foreign nonmain

---

(Judge Trust noting that the foreign representative was and is also counsel for the prepetition creditor and thus questioning his ability to act objectively.).

proceeding are not satisfied, this Court should deny recognition of the Chapter 15 petition.  In re Kemsley, 489 B.R. 346, 359 (Bankr. S.D.N.Y. 2013) ("If the debtor does not have its center of main interests or at least an establishment in the country of the foreign proceedings, the bankruptcy court should not grant recognition and is not authorized to use its power to effectuate the purposes of the foreign proceeding.") (citing Bear Stearns, 389 B.R. at 334); In re Millennium Global Emerging Credit Master Fund Ltd., 458 B.R. 63, 81 (Bankr. S.D.N.Y. 2011) ("The clear implication of failure to obtain any recognition, borne out by the case law, is that without an order of recognition the foreign representative cannot be heard in any court in the United States.") (citation omitted).

The SAL Liquidation Proceeding is Not a Foreign Main Proceeding Under Chapter 15

32.     Bankruptcy Code section 1502(4) defines "foreign main proceeding" as "a foreign proceeding pending in the country where the debtor has the center of its main interests," or "COMI."  11 U.S.C. § 1502(4).

33.     Bankruptcy Code section 1516(c) provides that "[i]n the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests."  11 U.S.C. § 1516(c).  While this provision creates a rebuttable presumption that the country where a debtor has its registered office will be its COMI, federal courts have focused on a variety of other factors as well. Morning MistHoldings Ltd. v. Krys (In re Fairfield Sentry Ltd.), 714 F.3d 127, 136 (2d Cir. 2013); see also In re Bear Stearns, 389 B.R. at 335 (The "rebuttable presumption" in § 1516(c) that the place of the entity's registered office is its COMI "at no time relieves a petitioner of its burden of non-persuasion on the issue.").

34.     In particular, this Court has developed a widely-adopted list of COMI factors,

while warning against their mechanical application:

> Various factors, singly or combined, could be relevant to such a determination: the location of the debtor headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

Id. (citing In re SPhinX, Ltd., 351 B.R. at 117).  This nonexclusive list is a helpful guide, but consideration of these specific factors is neither required nor dispositive.  Id.

35.     This analysis should be undertaken as of the date of the Chapter 15 petition.  See id. at 130 ("We conclude (as did the bankruptcy court and the district court) that the relevant time period is the time of the Chapter 15 petition, subject to an inquiry into whether the process has been manipulated.").

36.     "Recognition [under section 1517] is not a rubber stamp exercise, and any such presumption is rebuttable upon the Court's examination of any and all relevant facts." Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.), 480 B.R. 129, 135 (S.D.N.Y. 2012) (citing In re Gold & Honey, Ltd., 410 B.R. 357, 366 (Bankr. E.D.N.Y. 2009)); see also In re Basis Yield Alpha Fund (Master), 381 B.R. 37, 40 (Bankr. S.D.N.Y. 2008) ("[T]he Court concurs … that recognition under section 1517 is not a rubber stamp exercise.").

37.     Some courts have placed an increasingly heavy burden on the foreign representative to establish COMI.  In re Millennium Global, 458 B.R. at 81 (citing Reserve Int'l Liquidity Fund Ltd. v. Caxton Int'l Ltd., 2010 U.S. Dist. LEXIS 42216 (S.D.N.Y. April 29, 2010) (court in an interpleader action in New York refused to defer to a competing BVI liquidation on several grounds, including that the debtor's COMI was in the United States and the foreign liquidation would not be recognized in a Chapter 15 recognition proceeding); In re

British Am. Ins. Co., 425 B.R. 884 (Bankr. S.D. Fla. 2010) (court recognized judicial managers appointed in St. Vincent and the Grenadines because the insurance company did business there but refused to recognize judicial managers from the Bahamas because the company's relationship with the Bahamas was based exclusively on its registration there).

38.    Thus, in Bear Stearns, this Court rejected the argument that certain hedge funds' COMI was in the Cayman Islands, where the funds and certain investors were registered.  Bear Stearns, 374 B.R. at 129.  Instead, the funds' COMI was in New York, as their operations were controlled entirely from New York, they had no personnel or business in the Cayman Islands other than a "letterbox," there were no employees or managers in the Cayman Islands, the investment manager for the funds was located in New York, and the funds' books and records and liquid assets were located in the United States.  See id. at 130.

39.    In other words, even though a company is registered and/or traded in a one country, its COMI may well be located in the country of its business operations.  See SPhinX, 351 B.R. at 119 (rejecting recognition as foreign main proceeding because COMI was located outside of the Cayman Islands: the business was conducted outside of the Cayman Islands, as were most of the back-office operations; the only business done in the Cayman Islands apparently was limited to those steps necessary to maintain entities in good standing as registered Cayman Islands companies; there were no employees or managers in the Cayman Islands; and the debtors' boards, which contained no Cayman Islands residents, never met in the Cayman Islands); Collins v. Oilsands Quest, Inc., 484 B.R. 593, 596 (S.D.N.Y. 2012) ("The fact that Oilsands has a registered agent in Colorado and is listed on the American Stock Exchange is not sufficient to overcome the other evidence that Oilsands's headquarters and management are located in Canada."); Reserve Int'l, 2010 U.S. Dist. LEXIS at *43 (where management of a

group of funds was carried out in New York and the company conducted no business within the BVI and had no assets there, the BVI liquidation proceeding was unlikely to be recognized as a foreign main proceeding under Chapter 15); In re Basis Yield Alpha Fund (Master), 381 B.R. 37, 49 (Bankr. S.D.N.Y. 2008) (denying summary judgment to the foreign representatives on the authority of Bear Stearns and on account of COMI); Bondi v. Bank of America, N.A. (In re Eurofood IFSC Ltd.), Case 341/04, 2006 WL 1142304, p. 33 (E.C.J. May 2, 2006) (statutory presumption could be rebutted if such criteria allowed for the establishment that the debtor company's registered office was nothing more than "a letterbox" company not carrying out any business in the location in which its registered office is situated).

40.     Here, SAL is an Israeli shell company which, other than being formed in Israel approximately 22 years ago and raising money in Israel through a single bond issuance approximately seven years ago, has no other ongoing business in that country. Poznanski Aff. at ¶ 8. Rather, all of the assets of SAL have always been in the United States, including its offices, subsidiaries (all U.S. entities), real estate (located in Connecticut and Tennessee), and managers (Mr. Poznanski, residing in New York). Id. There is no support for the argument that Israel is SAL's "center of main interests."

41.     Even if, perhaps, SAL's Israeli presence and activity would have once satisfied the COMI analysis, that certainly was not the case at the time of the Chapter 15 petition, which, as stated above, is the relevant timeframe for this Court to consider.  See Morning Mist Holdings 714 F.3d at 130.

42.     Notably, Petitioners seem to agree that, as of the petition date, SAL's Israeli connections are de minimis.  To wit, Petitioners attempt to satisfy their burden of proof on this issue by alleging:

17

> Israel *was* the center of SAL's main Interests. SAL *was* organized
> under the laws of Israel; its registered office and exclusive place of
> raising funds *were* located in Israel; its known creditors are in
> Israel; SAL *was* managed, administered, operated and had banking
> arrangements in Israel; and its liquidation is currently being
> administered in Israel . . . ."

Petition at ¶ 113 (emphasis added). As is clear, almost every allegation supporting the COMI

analysis is a pas-tense statement because, the reality is, SAL has no current substantial operations

or business in Israel, nor has it since 2012. See Poznanski Affidavit at ¶ 8. Instead, all of its

operating assets, bank accounts, operations, and employees (in other words, its center of main

interests) are located in the United States. Id.

43.    Further, Petitioner's two present tense statements (i.e., those facts alleged

to exist as of the petition date), that its known creditors are in Israel and that its liquidation is

being administered in Israel, are woefully inadequate to support its COMI burden. With respect

to the first point, it's just not true (Poznanski is a creditor, as is each bank that holds a mortgage

on real estate owned by SAL's U.S. subsidiaries, as is the company that shovels snow for the

U.S. properties, etc.). Poznanski Aff. at ¶ 9. The presence of a subset of one group of creditors

is certainly not how Congress defines COMI, and the foreign representatives cite no case law to

the contrary.

44.    When boiled down to its essence, the Petitioners are attempting to

convince this Court that SAL's center of main interests exists in Israel because (i) some of its

bondholders live in Israel and (ii) those bondholders forced SAL into an involuntary liquidation.

For all of the reasons set forth above, these tenuous connections do not a COMI make, the SAL

Liquidation Proceeding does not qualify as a foreign main proceeding, and the Court should

deny recognition of Petitioners' Chapter 15 petition.

### III.    **The SAL Liquidation Proceeding is Not a Foreign Nonmain Proceeding Under**

**Chapter 15**

45.    Bankruptcy Code section 1502(5) defines a "foreign nonmain proceeding" as a "foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." See 11 U.S.C. § 1504(5).

46.    Bankruptcy Code Section 1502(2), in turn, defines "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity." See 11 U.S.C. § 1502(2).    The existence of an "establishment" is essentially a factual question, with no presumption in its favor.  Bear Stearns, 389 B.R. at 338.

47.    Although there is relatively little U.S. authority construing the term "establishment," Millennium Global, 458 B.R. at 84, at least some guidance can be drawn from case law in this District.  Specifically, in Bear Sterns, this Court found that the funds at issue did not have an "establishment" -- essentially, a local place of business -- in the Cayman Islands, noting that the auditing activities, review of insider transactions, and preparation of incorporation papers performed by a third party did not constitute "operations" or "economic activity" by the funds.  Bear Stearns, 389 B.R. at 339; see also Reserve Int'l, 2010 U.S. Dist. LEXIS 42216 at * 43 (where management of a group of funds was carried out in New York and the company conducted no business within the BVI and had no assets there, the BVI liquidation proceeding was unlikely to be recognized as a foreign nonmain proceeding under Chapter 15).

48.    As is eminently clear from the above "main-case" analysis, SAL has no current ongoing business activities in Israel.  In fact, the Petition doesn't even allege any such activities, and the Petitioners have not met their burden of proof.  As stated above, the only two current activities alleged in the Petition are (i) that a few of SAL's creditors (bondholders) live in Israel and (ii) that some bondholders commenced a liquidation proceeding in Israel.  Petitioners

cite no case law supporting the nonsensical position that the presence of a few creditors, notwithstanding a complete lack of operations, establishes "non-transitory" economic activity. In fact, actions taken by third parties do not satisfy this standard. <u>See Bear Stearns</u>, 389 B.R. at 339. Which leaves Petitioners relying on the fact that the liquidation proceeding has been initiated as the sole basis of its non-main analysis.

49. The SAL Liquidation Proceeding does not qualify as a foreign nonmain proceeding, and the Court should deny recognition of Petitioners' Chapter 15 petition.

## IV. <u>The Court Should Deny The Request For a Preliminary Injunction Because the Foreign Representatives Have Not Met the High Standard for Same</u>

50. The Second Circuit has recognized that a preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies . . . [and] must be used with great care." <u>Hanson Trust PLC v. SCM Corp.</u>, 774 F.2d 47, 60 (2d Cir. 1985); <u>see Johnson v. Burge</u>, 506 Fed. Appx. 10, 11 (2d Cir. 2012) (stating that a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.").

51. Courts in this circuit require a party seeking a preliminary injunction to establish an (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) (x) sufficiently serious questions going to the merits to make them a fair ground for litigation and (y) a balance of hardships tipping decidedly toward the movant. <u>Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.</u>, 596 F.2d 70, 72 (2d Cir. 1979); <u>accord Almontaser</u>, 519 F.3d at 508; <u>UBS Fin. Servs. v. W. Va. Univ. Hosps., Inc.</u>, 660 F.3d 643 (2d Cir. N.Y. 2011); <u>XL Specialty Ins. Co. v. Level Global Investors, L.P.</u>, 874 F. Supp. 2d 263, 271 (S.D.N.Y. 2012).

52. The most significant condition that must be present to support the granting of a preliminary injunction is a showing that, if the relief is not granted, irreparable injury during

the pendency of the trial will result. Capital City Gas Co. v. Phillips Petroleum Co., 373 F.2d

128, 131 (2d Cir. Vt. 1967) (emphasis added); Foundry Services, Inc. v. Beneflux Corp., 206

F.2d 214 (2d Cir.1953); Emmet & Co. v. Catholic Health East, 2011 U.S. Dist. LEXIS 54935

(S.D.N.Y. May 18, 2011).

53.    In addition, an irreparable harm must be actually irreparable and not

merely a financial loss where monetary compensation may be adequate.  S.B. Diamond Corp. v.

Gemological Inst. of Am., 2012 U.S. Dist. LEXIS 169314 (S.D.N.Y. Nov. 13, 2012)

54.    Typically, a preliminary injunction is prohibitory and generally seeks only

to maintain the status quo pending a trial on the merits.  Abdul Wali v. Coughlin, 754 F.2d 1015,

1025 (2d Cir. 1985).  However, when a party requests that a court go beyond the preservation of

status quo, it requires a more substantial showing of likelihood of success. Jacobson & Co. v.

Armstrong Cork Co., 548 F.2d 438, 441 (2d Cir. 1977). Therefore, even when applying the

traditional standard of "likelihood of success," a court should bear in mind the nature of the

preliminary relief sought, and should require a more substantial showing of likelihood of success

whenever the relief sought is more than preservation of the status quo.  SEC v. Unifund Sal, 910

F.2d 1028, 1039 (2d Cir. N.Y. 1990).  Stated differently, the more onerous the burden of the

injunction, the more persuasive showing of its entitlement to a preliminary injunction the movant

must make. See id.

Cohen & Turetsky Have Failed To Prove Irreparable Harm

55.    For approximately eight years, Poznanski has managed, operated, and

cared for SAL's U.S. assets pursuant to the terms of his agreement with his partners and the

company. Poznanski Aff. at ¶ 3. In an attempt to change their deal, Cohen & Turetsky baselessly,

and without evidence, accuse Poznanski (explicitly and/or implicitly) of diverting monies from

rental payment and company assets for non-authorized use, express concern that he will continue to do so in the near future, and state that this is the imminent harm about which they are concerned. However, this does not meet their burden, for the following reasons.

56.    First, any use of company monies and assets has been (i) authorized and (ii) with respect to money, first to pay expenses of the company and as otherwise permitted pursuant to their agreement with Poznanski. Id. at ¶ 10. In fact, Poznanski offered two years ago (before Judge Schweitzer) to permit a neutral third party monitor his use of company funds, and Cohen & Turetsky rejected the offer since the third party would not be their representative. See April Transcript, p. 35; Poznanski Aff. at ¶ 10.

57.    Second, the record is clear that these very allegations were made to Judge Schweitzer and, considering them in light of the arbitration agreement between the parties and Poznanski's position (that his actions are authorized per his agreements with his partners), he held that this is an arbitrable issue.

58.    Courts have been clear that to constitute irreparable harm, the harm must be certain and imminent. Cohen & Turetsky's agenda laden conspiracy theories, which they refuse to arbitrate pursuant to their agreement with Poznanski, simply do not meet that threshold.

Cohen & Turetsky Have No Likelihood of Success on The Merits

59.    Even if Cohen & Turetsky had met their burden of proving irreparable harm, they are neither likely to succeed on the merits nor, does the balancing of hardships tip in their favor.

60.    For the reasons set forth above (SAL has no ongoing business operations in Israel, SAL owns no property in Israel, SAL has no "establishment" in Israel, etc.), Cohen & Turetsky are not likely to succeed on the merits because SAL's attempt at recognition will likely

fail.  In fact, SAL only waited until the American justice system failed to serve its needs before

initiating proceedings in Israel, against U.S. public policy, as discussed above.    The SAL

liquidation proceeding is simply not a foreign main or nonmain proceeding and Cohen &

Turetsky are unlikely to win on the merits.

As Judge Schweitzer Found, the Balance of Hardships Tips in Favor of Poznanski

61.    Even if there is a sufficiently serious question about the merits of the case,

balancing the hardships not only fails to "decidedly" lean towards Cohen & Turetsky, but it tips

significantly for Poznanski.

62.    SAL's subsidiary SOVA Merritt LLC was only able to procure financing

to purchase the Connecticut real estate because Poznanski agreed to provide a personal guarantee

with respect to the mortgage debt. Poznanski Aff. at ¶ 11.    Poznanski agreed to do so, but only

after negotiating for and receiving protections from SAL, which activated in the event that his

guarantee was put at risk of being called because of actions taken by the company.  Id. at ¶¶ 11-

12.  The actions threatened by Cohen & Turetsky (up-streaming subsidiary funds in lieu of using

same to meet subsidiary obligations) directly threaten Poznanski's personal guarantee.  Id.

63.    Poznanski never would have tendered a personal guarantee without

receiving sole management rights of the company's U.S. assets (plus additional rights in certain

circumstances). Id. Therefore, freezing-out Poznanski from his ability to control the assets would

deny him of a carefully negotiated contractual right, without which he would not have given his

personal guarantee.[8] Id.

64.    On top of this is the fact that Cohen & Turetsky have made no efforts to

hide their intent to "upstream" money from the company's U.S. assets to fund the company in

Israel (i.e., pay the bondholders since there is no actual operation in Israel to do that job). Id. at ¶ 13.   This elevates the risk to Poznanski's personal guarantee.   It is clear that these real and legitimate hardships to Poznanski outweigh the hardships with which Cohen & Turetsky seem to be concerned.

Cohen & Turetsky are Proposing a Massive Change to the Status Quo, so Bear a Higher Burden

65.    Granting the SAL Administrators full authority to administer SAL's assets and affairs in the United States as SAL has requested would go far beyond the preservation of the status quo.   Considering Poznanski's eight years of asset management on behalf of the company, substituting Cohen & Turetsky (or their Israeli lawyers) as the new management regime in no way maintains the status quo. Cohen & Turetsky must, therefore, meet a higher burden of proof with respect to this mandatory injunction. Jacobson, 548 F.2d at 441.   Since Cohen & Turetsky are unable to show a likelihood of success in any event and under any burden, their requested preliminary injunction must be denied.

*[remainder of page intentionally left blank]*

---

[8] Additionally, Poznanski has other personally guaranteed liabilities with respect to the Tennessee property and other company matters. Poznanski Aff. at ¶ 13.

## **CONCLUSION**

66.    WHEREFORE, Poznanski respectfully requests that the Court (i) deny

recognition to the Petition, (ii) deny the relief requested in the PI Motion with respect to issuance

of a preliminary injunction, (iii) remove the temporary restraining order that had been in place

pursuant to this Court's Order entered on consent and dated November 17, 2014, and (iv) grant

such other and further relief as is just and proper under the circumstances.


Dated: November 20, 2014
      New York, New York

                                  MCGRAIL & BENSINGER LLP

                                  /s/ Menachem M. Bensinger
                                  Menachem M. Bensinger, Esq. (MB 3467)
                                  676A Ninth Avenue # 211
                                  New York, New York  10036
                                  Telephone:  (718) 434-2676
                                  Facsimile:  (718) 228-7717

                                  *Counsel to Abraham Poznanski*