```
                    UNITED STATES BANKRUPTCY COURT
 1                 SOUTHERN DISTRICT OF NEW YORK

 2   ------------------------------------    Case No. 14-13009 (scc)
     In re:                                  New York, New York
 3     SOVEREIGN ASSETS LTD. AND GUY GISSIN, December 3, 2014
                                             11:23 a.m. - 12:35 p.m.
 4               Debtor in Foreign Proceeding.
     ------------------------------------
 5                        TRANSCRIPT

 6              - 14-13009-SCC SOVEREIGN ASSETS LTD.
                 AND GUY GISSIN, CHAPTER 15 -
 7
                       STATUS CONFERENCRE
 8
            BEFORE THE HONORABLE SHELLEY C. CHAPMAN
 9             UNITED STATES BANKRUPTCY JUDGE

10   A P P E A R A N C E S :

11   For Abraham Poznanski:        MENACHEM M. BENSINGER, ESQ.
                                    McGrail & Bensinger LLP
12                                  676A Ninth Avenue, #211
                                    New York, New York 10036
13                                  (718) 434-2676; (718) 228-7717 fax

14   For Petitioners Adv. Guy      MICHAEL S. DEVORKIN, ESQ.
     Gissin and Adv. Rami          MARC D. ROSENBERG, ESQ.
15   Kogan, Special                ELIZABETH CONWAY, ESQ.
     Administrators:               Golenbock Eiseman Assor Bell
16                                    & Peskoe LLP
                                    437 Madison Avenue
17                                  New York, New York 10022
                                    (212) 907-7348; (212) 754-0777 fax
18
     For Nashville Plaintiffs:     LAWRENCE M. ROSENSTOCK, ESQ.
19                                 Markewich and Rosenstock LLP
                                   18 East 48th Street, 10th Floor
20                                 New York, New York 10017
                                   (212) 542-3156
21
     Of Counsel to Markewich       ROCCO CAVALIERE, ESQ.
22   and Rosenstock LLP for        Tarter Krinsky & Drogin, LLP
     the Nashville Plaintiffs:     1350 Broadway
23                                 New York, New York 10018
                                   (212) 216-8000; (212) 216-8001 fax
24

25
```

1  A P P E A R A N C E S :

2  *For the Nashville*          LAWRENCE ROSENSTOCK, ESQ.
   *Plaintiffs:*                Markewich and Rosenstock LLP
3                               18 East 48th Street
                                New York, New York 10017
4                               (212) 542-3156

5  *For MSCI 2007-HQ13*         JEFFREY D. VANACORE, ESQ.
   *Merritt Crossing LLC:*      GARY F. EISENBERG, ESQ.
6                               Perkins Coie LLP
                                30 Rockefeller Plaza, 22nd Floor
7                               New York, New York 10112-0085
                                (212) 262-6912; (212) 977-1642 fax
8

9  *Transcriber:*               AA EXPRESS TRANSCRIPTS
                                195 Willoughby Avenue, Suite 1514
10                              Brooklyn, New York 11205
                                (888) 456-9716; (888) 677-6131 fax
11                              aaexpress@court-transcripts.net

12       *(Proceedings recorded by electronic sound recording)*

13

14

15

16

17

18

19

20

21

22

23

24

25

Sovereign Assets Ltd. and Guy Gissin - 12/3/14                    3

1          THE COURT:  All right.  Thank you all for coming down

2    today.  My chambers reached out to you because this frankly has

3    not been presented in a way that I'm used to seeing things

4    presented.  Unless I missed something, we never had a discussion

5    about what a contested recognition hearing would look like.  Did

6    we?

7          MR. DEVORKIN:  No, not at a time I appeared, Your

8    Honor.

9          THE COURT:  No, we didn't.  So, for example, this is

10   what I have as opposed to having given me the opportunity to

11   talk to you about whether we want to have testimony by --

12   evidence by declaration; live testimony.  None of that occurred.

13   And this wasn't presented in any sort of organized fashion.  So

14   it's rather like just a document dumped on me.

15         Moreover, there have been issues that have been raised

16   that it might have been useful to discuss whether or not in fact

17   we're going to talk about them today.  For example whether or

18   not there should be relief from the stay or relief from the

19   relief provided on a recognition order with respect to the

20   Nashville Plaintiffs.  So I don't want to be unduly harsh, but

21   this simply was not presented in a way that it should have been.

22         I've read everything and I guess I'm still a little

23   confused about what folks think is going to happen without there

24   being any cross examination.  This is just -- it's being

25   presented in a somewhat unusual way.  I'm not trying to lay

Sovereign Assets Ltd. and Guy Gissin - 12/3/14                4

1  blame.  To the extent that we weren't proactive in helping you

2  do it the right way, I apologize, but it is what it is.

3        MR. DEVORKIN:  Well, I'm not -- I take everything you

4  say to heart, Your Honor.  Michael Devorkin, for the

5  Petitioners, Golenbock Eiseman Assor Bell & Peskoe.  And sitting

6  right next to me is Marc Rosenberg and Elizabeth Conway from my

7  office.

8        Until we received the papers ten days ago, and this is

9  not by any way of apologizing or excusing anything Your Honor is

10  concerned about; we didn't know whether anything was contested.

11  But our view is -- that being said --

12        THE COURT:  Right.

13        MR. DEVORKIN:  -- our view really is that on the legal

14  issues, Your Honor has to determine there really are no relevant

15  contested facts.

16        THE COURT:  On recognition.

17        MR. DEVORKIN:  On recognition.  I think on -- and we

18  could almost go through that today --

19        THE COURT:  Right.

20        MR. DEVORKIN:  -- why we think that's the case.

21        THE COURT:  Okay.  But this is what -- it would have

22  been helpful to -- from my perspective, what occurred was there

23  was an ex-parte TRO, right?  And then there were some consensual

24  extensions of time.  And then the next that happened was this.

25  And then at that point, it would have been useful to clarify who

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          5

1    wants to do what to whom.  Because I think that you're right.

2    On the narrow issue on recognition and I haven't met the folks

3    on the other side, yet; but on the narrow issue of recognition,

4    in my view, nobody really raises anything of interest.

5    Recognition is basically a check-the-box exercise.  So to the

6    extent that that the opposition believes that they are raising

7    questions of fact that preclude my entering an order recognizing

8    the Israeli proceeding, I'm not seeing it that way.

9          I mean the most I think is that there seems to be an

10   argument that § 1506 applies and that because of everything

11   that's gone before, it would be manifestly contrary to public

12   policy to recognize the case -- to recognize the proceeding.

13   But on the issues of COMI, the collective nature of the

14   proceeding, the compliance with § 109, under _Barnett_, all that,

15   I don't feel that I need to have an evidentiary hearing.  So

16   that's kind of the first level of questions.  Then you get to,

17   am I going to enter an order that just gives you all the relief

18   or does someone have something to say about why the relief

19   should be less than what would ordinarily follow from

20   recognition.

21          MR. DEVORKIN:  If I can pick up --

22          THE COURT:  So, I hope I'm making my concerns clearer

23   to you.

24          MR. DEVORKIN:  I think so.  Yes, you are, Your Honor.

25   I just wanted to say again, I guess by way of explaining

Sovereign Assets Ltd. and Guy Gissin - 12/3/14                6

1   ourselves in terms of what we conveyed to Your Honor's clerk

2   yesterday is we do have somewhat of a logistic problem which was

3   somewhat at least driving my thinking.  I agree 100 percent with

4   Your Honor.  We don't think there's a contested factual issue on

5   recognition.  And for reasons I can address, I don't think

6   there's a real contested issue on preliminary injunction.  But

7   let's just put that to the side for a second.

8            Mr. Gissin, who's one of the Petitioners, is in the

9   courtroom with two other colleagues from Israel that are in the

10  office of Mr. Kogan, the other Petitioner.  Mr. Samir, he's a

11  lawyer in Israel, and Mr. O'Had Carell and Michael Henshin are

12  seated next to him.

13           THE COURT:  Okay.

14           MR. DEVORKIN:  And Mr. Gissin was going to be my

15  witness.  He's the one who submitted the reply declaration --

16           THE COURT:  Right.

17           MR. DEVORKIN:  -- and he's been here all week.  I

18  think he would testify today because, as Your Honor is probably

19  aware, he intended to fly out tonight.

20           THE COURT:  Okay.

21           MR. DEVORKIN:  It's difficult to fly out on Thursday

22  night --

23           THE COURT:  I understand.

24           MR. DEVORKIN:  -- and get back in Israel before the

25  Sabbath.

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          7

1      THE COURT:  I understand.

2      MR. DEVORKIN:  And if he had to testify for any

3  reason, and I don't think he really addresses the preliminary

4  injunction issues.  But if he had to testify --

5      THE COURT:  Well, this is where -- I want to try to

6  move forward instead of --

7      MR. DEVORKIN:  Okay.

8      THE COURT:  -- harping on what happened in the past.

9  But if no one wants to cross examine Mr. Gissin, then he can go

10  to the airport later today.

11      MR. GISSIN:  Thank you.  My wife thanks you.

12      THE COURT:  Okay.  So, if nobody intends to do that,

13  but I couldn't be in a -- I just simply did not know --

14      MR. DEVORKIN:  Understood.  So, I was trying to be

15  accommodating to the -- I raised this this, I think, the first

16  instance, because I was trying to be accommodating to the other

17  side to see whether they had that interest.  And if they would,

18  I was willing to dispense with cross examining their witnesses

19  because of my legal views about where we are on the facts.

20      THE COURT:  Okay.  So why don't I hear from the

21  objectors.  And to the extent that we have everybody here, we

22  can get as much accomplished today as we can.  One of the issues

23  was not really appreciating the scope of the objections and I

24  had a matter scheduled at 1:00.  Well, I'm now getting a

25  communication from that very large group of people that they may

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          8

1   not want to come down until 2:00 or 3:00.  So I'm trying to

2   balance all of you as best I can.  So let me hear from the

3   objectors.  First with respect to the issue of recognition.

4   Because the objections -- well, let me not characterize.

5           MR. BENSINGER:  Good morning, Your Honor.

6           THE COURT:  Good morning.

7           MR. BENSINGER:  Menachem Bensinger, from McGrail &

8   Bensinger, on behalf of Abraham Poznanski.

9           THE COURT:  Okay.

10           MR. BENSINGER:  I may be responsible for the biggest

11   pile of papers over there.

12           THE COURT:  You are.

13           MR. BENSINGER:  Okay.  Well, I apologize if that's

14   needed.  Your Honor, our feeling with respect to recognition as

15   it relates to live testimony and cross examination, is we feel

16   like the record that's before this Court is sufficient for our

17   arguments, unless Mr. Devorkin feels the need to put on live

18   testimony in which case as he and I discussed.  Then once

19   witnesses are here, then it changes the analysis of what

20   witnesses need to come to rebut.  But just based on what's

21   before this Court right now, we're okay moving without cross

22   examining Mr. Gissin.

23           THE COURT:  Okay.  And is Mr. Poznanski here?

24           MR. BENSINGER:  He is not.

25           THE COURT:  Okay.

1          MR. BENSINGER:  We believe --

2          THE COURT:  And nobody wishes to cross examine Mr.

3   Poznanski?

4          MR. DEVORKIN:  Can I consult with my client?

5          THE COURT:  Sure.

6          MR. DEVORKIN:  Your Honor, I think because his

7   testimony does bridge over into the preliminary injunction

8   issue, I think I'd like to reserve on that until we have some

9   further discussion about that.

10         THE COURT:  Well see, that's the thing and that's

11  where getting together might have provided some clarity.  And

12  again I apologize for my role in that.  I have a lot of other

13  things.  A lot of other groups like you that I have to deal

14  with.  But to me I don't quite understand how you think you

15  might prevail on the preliminary injunction without providing

16  something more than what you've provided.  I mean that's just

17  the reality.

18         So, you've given me -- in papers you've given me a

19  version of some of the facts but the point of having a

20  preliminary injunction hearing is to have a preliminary

21  injunction hearing, you know, a substantial likelihood of

22  success on the merits, etcetera.  And I don't believe that

23  anything that you've supplied really you know rebuts the

24  allegations that have been put forward.  So they have the burden

25  of going forward and then you have your own burden.  I mean I

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          10

1   don't want to turn this into law school, which is part of the

2   problem that I'm having.

3          So, we could wade into it and see what happens.  And

4   I'm prepared to keep going today and actually go to the actual

5   hearing, as opposed to continuing to treat this as a status

6   conference, which is what I had suggested yesterday in light of

7   at least my confusion.  But if all the parties in interest are

8   here and prepared to proceed, then let's just do it.

9          MR. BENSINGER:  Well, Your Honor, with respect to that

10  point, I'm now starting to hear some uncertainty from Mr.

11  Devorkin as to whether he wants to put witnesses on.  And if

12  that's the case, specifically with respect to the TRO, then

13  perhaps we would call our witness.  So I apologize that this

14  wasn't worked out beforehand.  I agree.  I'm not disagreeing

15  with the Court.

16         THE COURT:  Okay.  But if he's -- he's seeking the

17  preliminary injunction.  If he's prepared to proceed without a

18  witness, and you don't have a witness, then I'll rule.

19         MR. BENSINGER:  Well, Your Honor, as we've expressed

20  in brief, we belief he has the burden.  So that was the basis

21  for the initial statement.

22         THE COURT:  Okay.

23         MR. BENSINGER:  That said, based upon what I'm hearing

24  now, which is a different conversation than what he and I had

25  earlier, we might like to have our witness hear, and I of course

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          11

1   would have had him here had thought this might be an actual

2   hearing.

3          THE COURT:  Okay.  But let me ask again.  Does

4   Sovereign intend to call any witnesses in support of the

5   preliminary injunction?

6          MR. DEVORKIN:  No.

7          THE COURT:  So, no.

8          MR. BENSINGER:  Your Honor, based upon the comments

9   today I'm hearing though, I'm going to discuss with my client

10  whether he'd like to testify.  And of course he would have been

11  here had there been a hearing.  He was planning on being here

12  tomorrow, but I thought this was a pre-trial.

13         THE COURT:  Well, then let's do recognition today.  Or

14  let's do the whole thing tomorrow and you can get your act

15  together.  This all should have been worked out in advance.  Set

16  forth in a letter or a pretrial order of some kind and not just

17  made up on the fly.  So, I need you to tell me what you'd like

18  to do.

19         MR. BENSINGER:  Your Honor, perhaps the parties,

20  unless anybody else here wants to speak, could have a few

21  minutes to confer amongst themselves.  Does that make sense?

22         MR. DEVORKIN:  It's fine with me.

23         MR. BENSINGER:  Okay.

24         THE COURT:  Again, I'll reiterate.  I believe on

25  recognition, despite the volume of the papers, I don't think

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          12

1    there are any factual issues.  I don't think there are any

2    genuine factual issues with respect to recognition of the

3    foreign proceeding.  I mean I know that there are allegations

4    that have been made about operation of the United States versus

5    Israel, but giving you my tentative view that under the regime

6    established in Chapter 15 and based on the declaration of Mr.

7    Gissin and all the supporting papers, nothing rises to the level

8    of a factual issue in my view.

9            MR. BENSINGER:  Well, of course, Your Honor, we would

10   appreciate the opportunity to attempt to convince the Court

11   otherwise.

12           THE COURT:  Okay.  All right.  Well, do you want to

13   talk about what we do today versus coming back tomorrow?  What

14   time did we give you tomorrow?

15           MR. BENSINGER:  1:00 p.m.

16           MR. DEVORKIN:  One o'clock.

17           THE COURT:  One o'clock.  I would like though to not

18   penalize Mr. Gissin and the other folks from Israel by causing

19   them to have to stay if at all possible.  It just doesn't see

20   that that's on anybody's -- the possibility of anybody's radar

21   screen at this point.

22           MR. DEVORKIN:  Our position, Your Honor, is they

23   don't, although they'd like to watch the argument, and find it

24   interesting if they could, they don't have to be here for that.

25           THE COURT:  Okay.

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          13

1          MR. DEVORKIN:  And just so we're also clear, I'm

2    proffering their testimony through their --

3          THE COURT:  Through the declarations.

4          MR. DEVORKIN:  -- declarations.  And both sides agree

5    on that, that's direct testimony.

6          THE COURT:  Right.

7          MR. DEVORKIN:  And if --

8          THE COURT:  And then you're telling me you had an

9    agreement that there was going to be no cross examination.

10         MR. DEVORKIN:  Right.  But it's mutual.  But if Mr. --

11         THE COURT:  Poznanski.

12         MR. DEVORKIN:  -- Poznanski -- I'm sorry -- Mr.

13   Bensinger wants to cross examine Mr. Gissin, the only thing I

14   ask is that he tell us now and do that, so I can let him go.  If

15   he's not going to cross examine him, I'm not going to offer him

16   on preliminary injunction issues.  He's really a witness on the

17   recognition issues only.  He doesn't have knowledge about the

18   preliminary injunction issues.

19         THE COURT:  Okay.

20         MR. DEVORKIN:  I don't need him for that.

21         THE COURT:  Okay.

22         MR. DEVORKIN:  And I'm perfectly happy to have them

23   have Mr. Poznanski testify about either of those issues.  And I

24   don't need Mr. Gissin in reply for that.

25         THE COURT:  Okay.  So Mr. Bensinger, it seems that no

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          14

1   matter what you decide about calling Mr. Poznanski that we ought

2   to be able to allow Mr. Gissin to leave.

3          MR. BENSINGER:  Not necessarily, Your Honor.  Given

4   our conversations today, I might in fact like to ask Mr. Gissin

5   some questions.

6          THE COURT:  Well, but here's the thing.  You know,

7   really this is not supposed to be let's make a deal.  You're not

8   supposed to be able to hear my concerns about the presentation

9   of the papers and then change the playing field.  So to the

10  extent that I've created this problem by saying this was a pre-

11  trial conference, before we said that presumably you had made a

12  decision to not cross examine Mr. Gissin.  And we ought to stick

13  by that.

14         MR. BENSINGER:  Your Honor, actually the decision was,

15  the most recent email from Mr. Devorkin was he was reserving his

16  opinion.  He wanted to wait and see what the judge said about a

17  hearing today.  So that's where we left things.

18         MR. DEVORKIN:  That's correct.  But I'm saying --

19         THE COURT:  He's saying now --

20         MR. BENSINGER:  Well, that's fine.  But given that he

21  reserved for the hearing, and we're at the hearing now, it's

22  only fair for me to have the opportunity to consider the same

23  factor he wanted to consider.

24         THE COURT:  Okay.  So consider it's twenty minutes to

25  twelve.

Sovereign Assets Ltd. and Guy Gissin - 12/3/14        15

1          MR. BENSINGER:  Okay.

2          THE COURT:  All right.  And I'm asking --

3          MR. BENSINGER:  I'd like a few minutes.

4          THE COURT:  And I'm asking you.  We can take a short

5    recess; talk to each other; figure out what you want to do.  But

6    included in that you ought to, presumably since before you heard

7    from my chambers, you were prepared or not to cross examine Mr.

8    Gissin; what I'm saying is that let's try to accomplish that

9    today out of just simple courtesy.

10         MR. BENSINGER:  Understood.

11         THE COURT:  As long as you can't articulate a way in

12   which that compromises your client's due process rights, which I

13   certainly do not want to do.

14         MR. BENSINGER:  Understood.

15         THE COURT:  All right?

16         MR. BENSINGER:  Okay.

17         THE COURT:  So let's try to make some order out of

18   this confusion and find a path forward.  I'm not sure whether my

19   one o'clock crowd is coming in or not.  Even if they are, and

20   you want to continue to proceed starting at two o'clock or three

21   o'clock, I'll do everything I can to help you move forward.  All

22   right?

23         MR. BENSINGER:  Okay, thank you.

24         THE COURT:  So why don't -- we'll go back into

25   chambers.  I know the other -- counsel for the Nashville

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          16

1  Plaintiffs is here.

2          MR. CAVALIERE:  Yes.

3          MR. ROSENSTOCK:  Yes, we are.

4          THE COURT:  Okay.  Good morning.

5          MR. CAVALIERE:  Good morning.

6          MR. ROSENSTOCK:  Good morning, Your Honor.

7          MR. CAVALIERE:  Rocco Cavaliere, Tarter Krinsky, on

8  behalf of the Nashville Plaintiffs.

9          THE COURT:  Okay.

10          MR. ROSENSTOCK:  And Lawrence Rosenstock, Markewich

11  and Rosenstock.

12          THE COURT:  Okay.

13          MR. ROSENSTOCK:  Also on behalf of the Nashville

14  Plaintiffs.

15          THE COURT:  Okay.

16          MR. CAVALIERE:  Your Honor, could I just --

17          THE COURT:  Yes.

18          MR. CAVALIERE:  On factual issues, we agree we have no

19  concern about taking testimony.  As far as legal argument on any

20  issue, frankly, we thought today was a status conference.

21          THE COURT:  That's fine.

22          MR. CAVALIERE:  The reply was quite extensive.  There

23  was a bunch of case law in it.  We'd like to go through that,

24  the legal argument both on the recognition and the preliminary

25  injunction.  And we are prepared to do that tomorrow at 1:00

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          17

1   p.m.  But we can certainly go over some issues today.  To the

2   extent there's an issue about Mr. Poznanski's direct testimony

3   or cross examination, we're happy to take a break and discuss

4   it.

5          MR. BENSINGER:  So, Your Honor, if I understand this

6   correctly, one party is unable to proceed on the merits today.

7   Is that --

8          THE COURT:  Well, we indicated that today was a pre-

9   trial conference.

10          MR. BENSINGER:  Right.  Okay.

11          THE COURT:  So, that's what we did, but what I'm

12   saying to you is that given how things have evolved, I don't

13   want -- I'd like to be able to allow the folks from Israel to go

14   home today.

15          MR. BENSINGER:  Understood.

16          THE COURT:  So that they can get home before Shabbat

17   in Israel.

18          MR. BENSINGER:  Okay.

19          THE COURT:  And given that nobody has yet to identify

20   a topic on which they want to cross examine Mr. Gissin, then

21   there doesn't seem to be any impediment to his going on.

22          MR. BENSINGER:  Okay.

23          THE COURT:  All right?  So why don't we take a recess.

24   Somebody come and knock on my chamber's door when you're ready,

25   and we'll come out and we'll come up with a definitive game

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          18

1  plan.

2          MR. BENSINGER:  Okay.  Very good.

3          THE COURT:  Okay?

4          MR. BENSINGER:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          MR. CAVALIERE:  Thank you, Your Honor.

7          (Off the record.)

8          THE COURT:  All right.  Have we solved the world's

9  problems?  Or at least some of ours?

10          MR. BENSINGER:  Good afternoon, Your Honor.

11          THE COURT:  Good afternoon.

12          MR. BENSINGER:  Menachem Bensinger, Abraham Poznanski.

13          Your Honor, we are going to cross examine Mr. Gissin

14  now.  So that he can take his flight back to Israel.

15          THE COURT:  Okay.

16          MR. BENSINGER:  And this will be with respect to

17  recognition and other points in his declaration.  Assuming --

18  well, depending on how that goes, if I need a rebuttal witness,

19  I'll put Mr. Poznanski on tomorrow.  But that way, Mr. Gissin

20  can exit this country.

21          THE COURT:  All right.  Now, does anybody have a

22  problem with proceeding in that fashion now?

23          MR. DEVORKIN:  I think -- we were just going to

24  consult maybe if we took a half an hour for lunch.  He doesn't

25  have his papers.  He wants me to help give him some of the

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          19

1   papers so he can use.

2          THE COURT:  Yeah.

3          MR. DEVORKIN:  So, we'll go get --

4          MR. BENSINGER:  I'll need a little time to prepare the

5   questions.  I wasn't prepared for that.  But an hour should be

6   fine.

7          THE COURT:  Okay.  But to be fair, we all knew there

8   was going to be a hearing today.  You people thought there was

9   going to be a hearing today until we called and said what's

10  going on.  So I just want to cut off at the pass any sense that

11  there is any unfair surprise or unfairness here.  Because going

12  into what you thought was going to be a hearing today.  You

13  could have advised counsel that you wanted to cross examine.  So

14  I just don't want there to be an appearance on the record that

15  somehow this Court forced anyone's hand; caused anybody to be

16  deprived of their due process rights; or the like.

17         We're in this situation because all of the

18  conversations that have occurred here today didn't occur

19  earlier.  So I just want to be very clear on that score.  All

20  right?  And you folks, you too, could have said hey, we want to

21  cross examine Mr. Gissin before.

22         MR. CAVALIERE:  Correct, Your Honor.  And so I don't

23  stand to take any issue with regards to the cross examination.

24         THE COURT:  Okay.

25         MR. CAVALIERE:  And I did clarify with Mr. Devorkin

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          20

1    and his co-counsel that as far as the evidentiary hearing is

2    concerned, we have no issue, but my comments before are still

3    valid, and they don't disagree that legal argument with regard

4    to recognition, we'll still go forward tomorrow.

5              THE COURT:  Sure.  Sure.

6              MR. CAVALIERE:  I just wanted to clarify.

7              THE COURT:  Okay.  All right.  So, then why don't we

8    take a half an hour, 45 minutes, what works for you?  My one

9    o'clock just got cancelled, so I have a little more runway in

10   the afternoon.

11             MR. BENSINGER:  I'd like an hour, Your Honor.  I need

12   to prepare my Q&A.

13             THE COURT:  All right.  So, we'll take an hour.  We'll

14   reconvene at 1:30.  Mr. Gissin, you'll take the stand.  We'll

15   conclude with that.  And then we will have the balance of the

16   hearing tomorrow.

17             MR. BENSINGER:  Okay.  Your Honor, on a logistics'

18   question --

19             THE COURT:  Yes?

20             MR. BENSINGER:  I don't have all the documents that I

21   needed.  Is there a way to print things in the Court if nobody

22   has them here?  It would be stuff that's on the record.

23             THE COURT:  Well, it depends on the volume.

24             MR. BENSINGER:  I want ten copies of my pleadings.

25             THE COURT:  Ten --

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          21

1          MR. BENSINGER:  A joke, Your Honor.  That was just a

2     joke.

3          THE COURT:  Oh, that was a joke?

4          (Laughter.)

5          THE COURT:  I don't have a good sense of humor.  What

6     do you want copied?

7          MR. BENSINGER:  Just the declarations.  If they have

8     copies that's fine.  But he submitted I believe two.  Mr. Kogan

9     submitted one and Mr. Gissin submitted one.  The declarations in

10    support of the original papers, and the reply.  I don't

11    remember --

12         MR. DEVORKIN:  Why don't we talk about this?  I don't

13    know how many -- I have my own copy that I need.  We'll see what

14    we have extra here before we burden the Court.

15         THE COURT:  At Docket 2, is the declaration; Docket 3

16    is Mr. Kogan's declaration.  And there's the reply declaration

17    that has a lot of attachments to it.  So this would be very

18    difficult for me to copy this.

19         MR. DEVORKIN:  Well, why don't we not bother the

20    Court?  We'll talk together and figure it out.

21         MR. BENSINGER:  I'll see if we could figure it out.

22    If we need something printable.

23         THE COURT:  These two I can give you.  But these, no.

24         MR. DEVORKIN:  You want the exhibits too?  Or what do

25    you want?

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          22

1          THE COURT:  I mean if you want the exhibits that's --

2          MR. BENSINGER:  Do you have a full copy with the

3     exhibits?

4          MR. DEVORKIN:  Well, why don't we not bother the

5     Court?

6          MR. BENSINGER:  We'll discuss it.  Okay.

7          MR. DEVORKIN:  Why don't we figure this out ourselves?

8          MR. BENSINGER:  That's fine.

9          THE COURT:  See you at 1:30.

10          MR. DEVORKIN:  Thank you, Your Honor.

11          MR. BENSINGER:  Thank you, Your Honor.

12          THE COURT:  You can leave whatever you want here.

13          MR. BENSINGER:  Okay.  Thank you.

14          ALL COUNSEL:  Thank you, Your Honor.

15          THE COURT:  Sure.

16          (Cross-talk.)

17          (Off the record.)

18          THE COURT:  Ready to go?

19          MR. BENSINGER:  Yes, Your Honor.

20          THE COURT:  All right.  Mr. Gissin?  Am I pronouncing

21     your name correctly?

22          MR. GISSIN:  Yes.  Very Good.

23          THE COURT:  Okay.  Have a seat.

24          Would you raise your right hand please, sir?  Do you

25     solemnly swear or affirm that all the testimony you're about to

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          23

1   give before the Court shall be the truth, the whole truth, and

2   nothing but the truth?

3          MR. GISSIN:  I do.

4          THE COURT:  All right.  Thank you.  As a housekeeping

5   matter, shall we move into evidence the declarations?

6          MR. DEVORKIN:  I'm going to do that, Your Honor.

7          THE COURT:  Okay.

8          MR. DEVORKIN:  The Petitioner's move into evidence Mr.

9   Gissin's and Mr. Kogan's declarations with the petition and its

10  exhibits that were filed at the beginning of the case.  And

11  Gissin's reply declaration, dated December 1, 2014, with

12  Exhibits 13 through 25.  The original exhibits were 1 through

13  12.

14         THE COURT:  Right.  Okay.  Any objection to the

15  admission into evidence of those three declarations?

16         (No response.)

17         THE COURT:  All right.  Okay.  So, those are in

18  evidence.

19         (Trial Exhibit 1, Gissin's declaration; Exhibit 2,

20  Kogan's declaration w/petition and its exhibits; and Exhibit 3

21  Gissin's reply declaration, dated December 1, 2014 in evidence.)

22         MR. DEVORKIN:  It's with the petition, Your Honor.

23         THE COURT:  Of course.

24         MR. DEVORKIN:  That's what he verified.

25         THE COURT:  Well, the -- yes.  The petition -- I don't

Sovereign Assets Ltd. and Guy Gissin - 12/3/14          24

1   know that the petition needs to be moved into evidence.  It's a

2   part of the record.  But the declarations have been submitted as

3   evidence.  So they need to be moved into evidence as part of the

4   record.  So all of that is in.  The table is set for your cross

5   examination.

6          MR. BENSINGER:  On that housekeeping note, Your

7   Honor --

8          THE COURT:  Yes?

9          MR. BENSINGER:  -- we also would move to put into

10  evidence Mr. Poznanski's affidavit, which has been filed with

11  this Court as well in opposition to recognition.

12         MR. DEVORKIN:  I have no objection.

13         THE COURT:  Okay.  All right.  So Mr. Poznanski's

14  affidavit, which is I believe filed at Docket 19, and it has a

15  number of exhibits.  That's in evidence as well.

16         (Trial Exhibit 4, Poznanski's declaration w/exhibits

17  in evidence.)

18         MR. BENSINGER:  Thank you, Your Honor.

19         MR. ROSENSTOCK:  Your Honor, would it be appropriate

20  just to move in a declaration that was submitted on behalf of

21  Nashville, so the record will be complete on the objections?  So

22  at least the record will be --

23         THE COURT:  Any objection to moving in that

24  declaration?

25         MR. DEVORKIN:  No objection.

Guy Gissin - Cross (Bensinger)                    25

1          THE COURT:  Okay.

2          MR. BENSINGER:  No.

3          THE COURT:  Very good.  Thank you.

4          (Nashville declaration in evidence.)

5          (Guy Gissin, the Witness, Sworn.)

6                      CROSS EXAMINATION

7    BY MR. BENSINGER:

8    Q    Good afternoon, Mr. Gissin.  My name is Menachem Bensinger.

9    I'm an attorney.  And represent Abraham Poznanski in this

10   matter.  Could you please tell me very briefly in what capacity

11   you're here in this court today?

12   A    I'm the special administrator -- one of two special

13   administrators of Sovereign Assets Ltd., which is an Israeli

14   corporation, public corporation.

15   Q    Okay.  And is there currently a liquidation proceeding

16   pending in Israel with respect to Sovereign Assets Ltd.?

17   A    I'm not sure if pending is the right word.  There is an

18   order for liquidation.

19   Q    Okay.  And when was that order entered?

20   A    Something around July.

21   Q    Okay.

22   A    The order was given.  The request was filed in March or so.

23   Q    So if I understand you correctly, the request for an order

24   for liquidation was made to the court in Israel in March of

25   2014, and the court entered an order answering that request in

Guy Gissin - Cross (Bensinger)                    26

1   July of 2014.  Is that correct?

2   A    That's correct.

3   Q    Okay.  Are you taking any medication today or is there any

4   other reason why you would not be able to testify truthfully

5   today?

6   A    No.

7   Q    Okay.

8            MR. BENSINGER:  I'm going to hand the witness a copy

9   of a document titled "Declaration of Adv. Guy Gissin, Petitioner

10  in support of petition under Chapter 15 of the Bankruptcy Code

11  for Recognition of a Foreign Main Proceeding."

12           MR. DEVORKIN:  Will you be marking it?

13           MR. BENSINGER:  I'm going to mark this as Poznanski 1.

14           (Previously marked as Trial Exhibit 1.)

15           THE COURT:  Okay.

16  Q    Mr. Gissin, I just handed you a document, correct?

17  A    Yeah.

18  Q    Do you recognize this document?

19  A    Yeah, I do.

20  Q    What is this document?

21  A    This is a declaration I signed in the office of my

22  attorneys about a month ago when we filed the petition.

23  Q    And familiar with what you stated in your declaration,

24  correct?

25  A    Yeah.

Guy Gissin - Cross (Bensinger)                     27

1  Q    Okay.  Now, your declaration at paragraph 2, and I'll

2  paraphrase, says that you're familiar with all the legal

3  documents and legal proceedings pertaining to SAL and its

4  subsidiaries.  Is that accurate?

5  A    If that's what it says, it's accurate.

6  Q    Okay.  Would you mind reading paragraph 2 for a minute and

7  telling me what it says?

8  A    Yes.  "I have read the full-length petition and the

9  accompanying ex-parte motion for provisional relief and order to

10 show cause.  I and my staff have reviewed all the documents."

11 Okay.

12 Q    Okay.  So are you familiar with all of the documents that

13 your American attorneys have filed in this matter?

14 A    I guess so.

15 Q    Is that a yes?

16 A    Yes.

17 Q    Okay.  Thank you.

18         MR. BENSINGER:  I'm going to hand a document to Mr.

19 Gissin, titled "Reply declaration of Adv. Guy Gissin in support

20 of Petitioner's verified petition under Chapter 15 of the

21 Bankruptcy Code for Recognition of a Foreign Main Proceeding."

22 And "Motion for Provisional Relief for a Preliminary

23 Injunction."  I'll mark this as Poznanski 2.

24         THE COURT:  Okay.

25         (Poznanski Exhibit 2 in evidence.)

Guy Gissin - Cross (Bensinger)                    28

1   Q    Mr. Gissin, I just handed you a document, correct?

2   A    Yes.

3   Q    Do you recognize this document?

4   A    I do.

5   Q    What is this document?

6   A    This is a declaration that I filed this week.  I signed it

7   at the office of my attorneys.

8   Q    I'm going to ask you some questions about some of the

9   statements that you made in this declaration.  Stating with

10  paragraph 3, I'll read the first sentence.  "Israel has been and

11  continues to be the center of SAL's business activities."  Is

12  that what this sentence says?

13  A    Exactly.

14  Q    When you say "Israel has been and continues", what

15  timeframe are you referring to?

16  A    I'm referring to starting at 2007, if I'm not mistaken; up

17  until now.

18  Q    So you're testimony is then that from 2007 until today has

19  been and is the center of SAL's business activities, correct?

20  A    Absolutely.

21  Q    Okay.  If you wouldn't mind turning the page, still in

22  paragraph 3, the first sentence, the first new sentence on that

23  page is the last word on the second line.  And it starts with

24  the word SAL.  Do you see that?

25  A    Yeah.

Guy Gissin - Cross (Bensinger)                    29

1   Q    Okay.  I'm going to read this sentence to you piece by

2   piece and ask you some questions.  Is that okay?

3   A    Sure.

4   Q    Okay.  So reading from your declaration.  "SAL financed its

5   business."  How did SAL finance its business?

6   A    SAL raised bonds from the public 2007 or so, and then it

7   used those funds in order to purchase through its subsidiaries

8   assets in the states.

9   Q    Okay.  Now, you mentioned that SAL raised funds through the

10  bond issuance in 2007.  Was that issuance completed in 2007?

11  A    I think so.  I don't recall something else.

12  Q    Do you know if SAL ever had a second bond issuance after

13  the one that you just discussed that occurred in 2007?

14  A    It might.  I don't remember.  It might.  I don't remember.

15  Anyway, it raised 50 million shekel, which means something like

16  $13 million or $12.5 million from the public in Israel.

17  Q    So you don't know whether SAL ever financed through a bond

18  offering after 2007 in Israel.  Is that correct?

19  A    I don't remember.  I don't remember that they did.  I think

20  they did not.  I think they raised the money in 2007.  As far as

21  I remember I don't.

22  Q    Okay.  Now, returning to the sentence.  "Including

23  investments through its United States subsidiaries."  Now, what

24  investments are you referring to?

25  A    The two material assets that SAL purchased in the states

Guy Gissin - Cross (Bensinger)                    30

1    were one in Nashville and one in Connecticut.  And --

2    Q    And what type of assets -- I'm sorry.

3    A    I'm sorry?

4    Q    I'm sorry; I didn't mean to interrupt you.  Please

5    continue.

6    A    Part of it was through a loan that was granted and was

7    converted to Nashville -- if I'm not mistaken -- into

8    Nashville's property in the 401 Church Street interest.

9    Q    What is the nature of these two investments?

10   A    Investments in order to receive IRR at the end of the day.

11   Q    Well, let me be direct.  These were real estate

12   investments?

13   A    It was real estate investments through subsidiaries, yeah.

14   Q    Okay.  And when were these investments made?

15   A    It was made in -- most of it was made in 2008 or so.  At

16   the beginning.  In one or two years after the raising the bonds.

17   Q    Now, you testified a minute ago that these are SAL's

18   principal material assets.  The only principal assets of SAL,

19   correct?

20            MR. DEVORKIN:  Objection.  That's not what he said.

21            THE COURT:  Sustained.  Mischaracterizes his

22   testimony.

23            MR. BENSINGER:  Okay.  Let me restate it.

24   A    It's the main assets.  It's not the only assets.

25   Q    Okay.  So, your testimony is that the main assets of SAL

Guy Gissin - Cross (Bensinger)                    31

1   are these two pieces of real estate held indirectly through its

2   subsidiaries.

3   A    Uh-huh.

4   Q    Is that what you testified?

5   A    Uh-huh.

6   Q    Okay.

7          MR. DEVORKIN:  Your Honor, could we just make sure the

8   witness speaks his answers in word form so --

9          THE WITNESS:  Sorry.

10          THE COURT:  Yes.

11          MR. DEVORKIN:  And if you can keep your voice up

12   because it's being recorded, not transcribed.

13          THE WITNESS:  I will.  No problem.

14          THE COURT:  Very good.

15          MR. BENSINGER:  Okay.

16   BY MR. BENSINGER:

17   Q    You also testified that those main assets were acquired

18   sometime around 2007/2008, is that correct?

19   A    That's correct.

20   Q    So since the end of 2008 has SAL acquired any assets?

21   A    It did not acquire because it was in the process of the

22   main business of SAL.  Since that time was the find the solution

23   for the fact that they could not -- maybe I -- I'm sorry.  I'll

24   say it again.  Starting at 2010 or so, the company was in

25   trouble to find solutions to repay its bonds.  The main business

Guy Gissin - Cross (Bensinger)                    32

1   of SAL was handling the possible realization of those

2   investments and getting the bonds repaid.

3   Q    Okay.

4   A    And that was all in Israel.

5   Q    A little bit further back to your declaration in paragraph

6   3.   Four lines before the end of the paragraph.   Five lines;

7   excuse me.   The sentence begins, "Prior to the appointment of

8   the SAL administrators."   Do you see that sentence?

9   A    Uh-huh.

10  Q    Okay.

11  A    I do.

12  Q    Thank you.   I'm going to read from that sentence.   Prior to

13  the appointment of the SAL administrators, SAL's business was

14  managed and controlled in Israel by its board of directors."

15  Can you describe for me the nature of that board of directors of

16  SAL?

17  A    Of course.   The board of directors of SAL during all those

18  years was, there were 7 directors.   2 are external directors

19  according to Israeli corporate law, which were nominated by the

20  majority of the -- the un-interested shareholders of SAL.   The

21  other 5 directors were nominated by the total shareholders of

22  SAL.   And they consisted, as far as I remember, most of the time

23  as 3 or 4 that Poznanski offered, and 2 that his fellows who

24  were holding together the controlling company offered to the

25  general meeting of the shareholders.

Guy Gissin - Cross (Bensinger)                    33

1   Q    Now, under Israeli law, how does a board of directors take

2   action?

3   A    It's got to convene at least once in a quarter to prove its

4   financials, to publish it, and then they gather together even

5   more than this once they have a deal to do or any transactions

6   to approve.

7   Q    So is it fair to say that for the board of directors to

8   take action, it has to convene some sort of a meeting?

9   A    They usually do.  It might be over the telephone, but yeah.

10  According to -- and some of those must be even in a meeting

11  room.

12          MR. DEVORKIN:  I didn't hear the last part.

13          THE WITNESS:  Some of those meetings must be handled

14  in a meeting face to face and not over the telephone.

15  Q    So to be clear I understand, whenever the board of

16  directors would need to act, it would have to convene a meeting.

17  Sometimes the meeting could be face to face and sometimes it

18  could be electronically meeting.  Is that accurate?

19  A    Yeah.

20  Q    Okay.

21  A    And it orders -- if you want me to --

22          MR. DEVORKIN:  Your Honor, I'm getting some trouble.

23  I don't know if Your Honor is having trouble with the

24  microphone, but I'm --

25          THE COURT:  No.  Mr. Gissin, I'm going to ask you to

Guy Gissin - Cross (Bensinger)                    34

1  try to be a little bit more crisp with your enunciations.

2           THE WITNESS:  Okay.  I will try.

3           THE COURT:  Okay?

4           THE WITNESS:  I'm sorry.

5           THE COURT:  Very good.

6           THE WITNESS:  It's the first time I give evidence in

7  English, so I'm sorry.

8           THE COURT:  And I appreciate that.  So take your time.

9  I can hear fine.

10          MR. DEVORKIN:  I just thought sometimes he was getting

11 too close to the mic and it was breaking up.  That's all.

12          THE COURT:  There's a sweet spot.  You know the

13 expression sweet spot?

14          THE WITNESS:  Now, I know it.

15          THE COURT:  Okay.

16 A   Once again.  What?

17          THE COURT:  Do we have a question pending?  There's no

18 reading --

19          MR. BENSINGER:  There's no record?

20          THE COURT:  There's no reading back.

21          MR. BENSINGER:  Okay.

22          THE COURT:  No, there is record.  We're recording it.

23          MR. BENSINGER:  Okay.

24          THE COURT:  But there's no reading back like there

25 might be in state court.

Guy Gissin - Cross (Bensinger)                    35

1   A    The board of directors instructs its officers, the officers

2   of the company, how to take action and give them space to act in

3   this regard.

4   Q    Okay.  Do you know the last time the board of directors of

5   SAL convened?

6   A    I can find it in -- I have all the periodicals.  I don't

7   remember.  I don't recall right now.  But I guess it's somewhere

8   during 2013.  Maybe at the beginning of 2014.  I don't remember

9   exactly.

10  Q    Okay.  But to your recollection today, they did not convene

11  after the beginning of 2014, is that correct?

12  A    No, I didn't say that.  They have.  March 2014 -- sorry.

13  In February 2014, there was a bondholder meeting that

14  representatives of the company were adjourned there.  And there

15  was a decision to file the requests for liquidation of the

16  company.  And while we filed the request for the liquidation

17  during March 2014, we received the signed agreement of the

18  company to do so.  And the company approved -- and I think it's

19  one of the exhibits here.  Approved that the company does not

20  have any source of funding, and therefore it's got nothing

21  against the liquidation process that we are filing.

22  Q    Okay.  But I want to make sure I understand exactly what

23  you're saying. So, let me ask you again on that point.  Was the

24  meeting in 2014 that you just discussed where the bondholders --

25  the bondholder meeting, was that a board of directors' meeting

Guy Gissin - Cross (Bensinger)                    36

1   or was that a bondholder meeting or a combination?  Can you

2   clarify for me, please?

3   A    It was a bondholder meeting where the representatives of

4   the company, which means representative of the board of

5   directors adjourned.  So I guess -- I don't know if there was

6   meeting before at the board of directors or not.  I don't know.

7   Q    Okay.  Going back to your declaration, you testify still in

8   paragraph 3 that prior to the appointment of the SAL

9   administrators; I'm skipping a few words, "operated SAL's bank

10  account in Israel."  Do you see that?

11  A    Operated SAL's bank account in Israel; kept its records in

12  Israel."  Yeah, I see.

13  Q    Okay.  How many bank accounts did SAL have in Israel prior

14  to your appointment as a provisional liquidator?

15  A    I don't remember if it was one or two.  After our

16  nomination as provisional liquidators, we send letters to all

17  the banks, and they respond, and we transfer any funds.  There

18  were no funds in the bank account.  But that's the procedure we

19  do every time we are nominated.  So we did it at the beginning.

20  I think it was two bank accounts, but I'm not sure.

21  Q    Okay.  Now, you just stated that when you contacted SAL's

22  banks in Israel, they had no funds in them, correct?

23  A    Correct.

24  Q    Do you know when the last time is that the bank accounts of

25  SAL were used in Israel?

Guy Gissin - Cross (Bensinger)                    37

1  A    I don't recall.  I can check.

2  Q    Do you remember approximately when you made the requests

3  from those bank accounts for information?

4  A    I don't remember exactly.  But usually we do it within a

5  few days after our nomination.  So I guess that's what we did.

6  Q    And that nomination again was sometime in July of 2013?

7  A    No, March.  March.

8  Q    March.  Excuse me.  So sometime in or around March of 2014,

9  you contacted the banks and learned that they have no money in

10 them.  Is that correct?

11 A    That's right.

12 Q    And since that time have those bank accounts been used?

13 A    No.  There is a new bank account in our names or in the

14 names.  That's what you do in Israel in a liquidation process.

15 You establish a new bank account.  Any movement in the assets,

16 in the financial assets of the company must be through this bank

17 account, which me and Rami, my colleague, are the only ones that

18 have the signatory rights to.

19 Q    Again in paragraph 3 of your declaration, it states "Kept

20 its records in Israel."  What records did SAL keep in Israel?

21 A    SAL has had, during the years, CFO; had secretary of the

22 company; had CPAs that checked its financials.  They were

23 looking for -- and it was held in the computers.  They were

24 escorted by a lawyer called Eron Quincione, who kept the records

25 for all the meetings and everything.

Guy Gissin - Cross (Bensinger)                    38

1  Q    So the records of SAL were only electronic?  Or they were

2  papers records as well?

3  A    There were paper records, some of them.  Some of them

4  signed; some of them not signed.  It was not always proper as it

5  should have been maybe, but it was -- we, as the liquidators and

6  later on as the administrators, absolutely received the

7  documents and we tracked them already.

8  Q    And all of these documents came from the attorney that you

9  just mentioned?

10  A    It's not only from the attorney, it's from the CPA; it came

11  from the secretary of the company; and (inaudible).

12  Q    Again turning to that last sentence of paragraph 3 of the

13  declaration.  It states "Managed employees from Israel."

14  A    Uh-huh.

15  Q    As of October 31, 2014, about a month ago, how many

16  employees did SAL have?

17  A    We do not have any employees right now.  The employees of

18  the company -- the company does not have funds to -- sorry.  The

19  liquidators and the administrators do not have funds to employ

20  employees right now.  We are mainly focused on investigating; on

21  interviewing all the managers and looking for the assets and

22  looking for the resources that the company came to its

23  situation.

24  Q    When you were appointed as a provisional liquidator, did

25  SAL have employees at that time?

Guy Gissin - Cross (Bensinger)                          39

1  A    I don't remember exactly.  It had directors that acted in

2  the name of the company.  It had -- yeah, it had.  David Cohen,

3  who served as a secretary at that time, I don't think he was

4  paid.

5  Q    Okay.  So David Cohen served as a secretary --

6  A    He was a director and a secretary at that time.

7  Q    Does David Cohen still serve as a secretary?

8  A    No, he does not.  Once we were nominated, all the officers

9  and the board of directors lost its powers and the powers that

10 were granted to us, they are still -- they did not resign, but

11 they're still registered as officers of the company, but they no

12 longer have any powers.

13 Q    So, other than directors that were acting in multiple

14 capacities with more than one role, were there any other

15 employees of the company at the time that you were appointed as

16 provisional liquidator?

17 A    No, I don't think so.

18 Q    Turning again to the end of paragraph 3 in your

19 declaration, it states "Directed the affairs of the U.S.

20 subsidiaries from Israel."  How did SAL direct the affairs of

21 the U.S. subsidiaries?

22 A    Not too good.

23 Q    I'm sorry?

24 A    Not so good.  They were in contact with the subsidiaries in

25 the states.  They were fighting; they were -- I'm sorry.

Guy Gissin - Cross (Bensinger)                              40

1   Fighting is not the right word.  They were looking for

2   information.  They were asking questions.  They were trying to

3   receive data from the American subsidiaries.  They hired former

4   CFO of the company named Thrica Govorse in order to try to help

5   them to get to the information.  They had a lot of problems

6   receiving information and to do something about the assets.

7   Q    Now, you mentioned a few times in your answer the word

8   "they".  That they tried to receive data; they --

9   A    Members of the board of directors.

10  Q    So we're talking about the board of directors, is that

11  correct?

12  A    Yeah.  Absolutely.

13  Q    Okay.

14  A    They managed the company at that time, and there was a Mr.

15  Swedloff, who was the CEO of the company at that time.  He was

16  one of the members of the board as well if I'm not mistaken.

17  But he was not an employee getting salary from the company.  But

18  he was the CEO of the company, and he was ordered by the board

19  of directors to look for this information.  And they handled the

20  negotiations with the bondholders at that time to try to find a

21  solution for the information and for possible recovery of the

22  bonds.

23  Q    When did the board of directors convene to give this

24  direction to Mr. Swedloff?

25  A    I don't remember right now, but I know that Mr. Swedloff is

Guy Gissin - Cross (Bensinger)                    41

1   the CEO and made contacts with the bondholders and with the

2   subsidiaries in the name of the board of directors.  In the name

3   of the company, of course.  So as far as I'm concerned, it's in

4   the name of the board of directors.

5   Q   Would you please turn to paragraph 7 of the declaration in

6   front of you?

7   A   Sure.

8   Q   I'm going to read the second sentence of paragraph 7.  "We

9   conducted our activities out of my law firm's office, which is

10  located at Habarzel Street, 6th Floor, Tel Aviv, Israel, 69710

11  and Adv. Kogan's office, which is located at 4 Berkowitz Street,

12  the Museum Tower, 23rd Floor, Tel Aviv, 64238, Israel.  Is that

13  what it says?

14  A   Yes, that's what it says.

15  Q   Why didn't you conduct these activities out of SAL's

16  office?

17  A   Because we did not have at that time any funds to have a

18  separate office.  And even before that, if I'm not mistaken, the

19  company was handled through Eron Quincione's office as I told

20  you before.  The company was handled by its board of directors,

21  and through the services that we received from lawyers and

22  others.

23  Q   So on October 31, 2014, there was no physical office of the

24  company in Israel, is that correct?

25          MR. DEVORKIN:  Objection.

Guy Gissin - Cross (Bensinger)                    42

1   A   It's not correct.

2   Q   Where was the physical office of SAL in Israel on October

3   31, 2014?

4   A   As far as I know, at the offices of its counsel, at his

5   office.  Usually they adjourned and set their meetings sometimes

6   at other places, and the records were kept there.

7   Q   So aside from having the ability to utilize counsel's

8   office, was there another office that was SAL's place of

9   business in Israel on October 31, 2014?

10  A   '14?

11  Q   '14.

12  A   2014?  2014 was a week ago.

13  Q   A month ago.

14  A   A month ago.

15  Q   Correct.

16  A   A month ago, there was no -- there was no office of the

17  company.  All actions in a company that is liquidated, that does

18  not have employees and does not have factories to deal with,

19  which is a holding company that holds assets and the estate is

20  handled through the liquidator's office.  That's what it does

21  usually.

22  Q   Prior to being appointed as a liquidator, did SAL have its

23  own physical office in Israel?

24  A   It did in the past.  It did have offices in Jerusalem and

25  then they passed it to Tel Aviv.  I don't remember the exact

Guy Gissin - Cross (Bensinger)                          43

1   date.   They did have office.

2   Q    Okay.  And then when you were appointed as liquidator that

3   changed, is that correct?

4   A    That changed, yeah.  We changed the office address to my

5   office or to Rami's office.  I don't remember.

6   Q    And what happened to the office space that SAL had been

7   using?

8   A    I'm sorry.  Once again, I'm talking about the past.  During

9   the period that was a month before or two months before the

10  liquidation, filing the liquidation motion in Israel, I'm

11  talking about February or March, 2014, the office was -- the

12  formal office of the company was at its attorney's office, Eron

13  Quincione.

14  Q    So in February/March of 2014, SAL's only office was at its

15  lawyer's office.  Is that correct?

16  A    Yeah.

17  Q    But at some point prior to that date, it had a physical

18  office.

19  A    Absolutely.

20  Q    Okay.  Do you remember around what date it closed its

21  physical office or moved out of its physical office?

22  A    No, I don't recall.

23  Q    But it was prior to February of March of 2014, is that

24  correct?

25  A    I guess close to that.  I don't remember exactly.  I know

Guy Gissin - Cross (Bensinger)                    44

1  that we filed.  There was a liquidation filed in Jerusalem at

2  the beginning of 2013 because the office was at Amvo Lamore.

3  It's the name of the street that the office of the company was

4  in Jerusalem.

5  Q    But in any event, shortly after you filed the liquidation

6  papers in Israel, the office was closed, is that correct?

7  A    Yeah.  It was moved into other offices.

8  Q    Understood.  If I could direct your attention, please, to

9  Paragraph 12 of your declaration?  This paragraph references in

10 the first sentence the provisional liquidation order, is that

11 correct?

12 A    Yes.

13 Q    What is the provisional liquidation order that it's

14 referring to?

15 A    When we filed the liquidation request in Israel -- in

16 Israel, usually, when you file a liquidation request, together

17 with it you file a request and especially in place is that the

18 company does not have a factory or something that handles an

19 office or that can handle the company at that time.  You file a

20 request for temporary liquidation of provisional liquidators,

21 nomination of provisional liquidators to handle the business of

22 the company.  And that's what we did.  We were nominated and we

23 started acting.

24 Q    And did you start acting when you filed the papers in March

25 of 2014 or after the provisional liquidation order was entered?

Guy Gissin - Cross (Bensinger)                    45

1   A   I think it was -- I could not act before the order was

2   given.

3   Q   Okay.

4   A   And it was given at about a week after, a few days after we

5   filed the request.

6   Q   So if I could direct your attention to paragraph 6 of your

7   declaration do you see at the end of that paragraph it discusses

8   the provisional liquidation order?

9   A   One second.  On page -- page?

10  Q   Page 6.

11  A   You said chapter 6.

12  Q   Excuse me.  My apologies.  Paragraph 6.

13  A   Paragraph 6.  "Approaching all the banks"?  That's what you

14  mean?

15  Q   No.  Page 2.

16  A   Okay.

17  Q   Paragraph 6.

18  A   Okay.  I'm with you.

19  Q   I'll read from the paragraph.  "As discussed in paragraph

20  81 of the petition, on March 24, 2014, the Israeli District

21  Court issued a provisional order."  Is that provisional order

22  the provisional liquidation that we were just discussing?

23  A   Yeah, that's the same.

24  Q   Okay.  So then from March 24, 2014 until today, you and Mr.

25  Kogan had been acting in your capacity as liquidators pursuant

Guy Gissin - Cross (Bensinger)                    46

1    to that order, is that correct?

2    A    Up until July 7 when we had been nominated as special

3    administrators instead of provisional liquidators.

4    Q    And did your duties or roles change at that time when you

5    were nominated for a new role?

6    A    If you want to go to Israeli liquidation law, I can

7    explain.  The basic things are the same activities.  It's

8    different in a few things.  But we did not change our attitude;

9    we just came to the point that there was no objection to the

10   request.  And therefore the order came into force and we were

11   eliminated as special administrators.

12   Q    Now, paragraph 6 says that March 24, 2014 is the date that

13   the order was entered, correct?

14   A    March 24, 2014, yeah.

15   Q    Okay.  Can I direct you now to paragraph 12 on page 4?

16   I'll start reading from the beginning.  "In accordance with the

17   provisional liquidation order, we also began our investigations

18   and administration in Israel of SAL's assets, which included,

19   but was not limited to the following activities which occurred

20   in Israel (colon)."  Do you see where I am in paragraph 12?

21   A    Uh-huh.  I do.

22   Q    "Item 1, providing the notice of proceedings discussed

23   above.  Item 2, conducting interviews of former employees."  How

24   many interviews of former employees did you or Mr. Kogan

25   conduct?

Guy Gissin - Cross (Bensinger)                    47

1   A    Something like ten.  Its employees and directors and

2   officers.  Both.  And CFO.  At least ten.

3   Q    At least ten?

4   A    Yeah.

5   Q    Reading further in that paragraph, Item 3.  "Meeting with

6   former SAL board members."

7   A    I put it together.  I meant it together.  Okay?  The ten is

8   together.

9   Q    So when you said a minute ago that you interviewed ten

10  former employees, you meant ten former employees/board members?

11  A    Yeah.

12  Q    Okay.

13  A    I think three or four were employees.  I can give you the

14  names if you're interested.  No problem.

15  Q    Item 4 in paragraph 12.  It says "Holding bondholders'

16  meetings."

17  A    That's right.

18  Q    When did you hold a bondholder meeting?

19  A    I don't remember the specific date, but we needed to

20  discuss with the main creditors and they called for meetings.

21  So we went there to report as the bondholders are the main

22  creditors.  We went to report and to discuss with them possible

23  actions that might give them relief.

24  Q    Do you remember who participated in those bondholder

25  meetings?

Guy Gissin - Cross (Bensinger)                        48

1   A    Yes.

2   Q    Could you --

3   A    In general there were -- usually it's 20 people.  I don't

4   remember each one of them, but most of them I know.

5   Q    Was Danny Cohen there?

6   A    Danny Cohen?

7   Q    Yes.

8   A    Danny Cohen?  Who's Danny Cohen?  David Cohen?  Danny

9   Turetsky?  Who are you looking for?  I don't know any Danny

10  Cohen.

11  Q    Okay.  I apologize.  Was Edwin Cohen at the bondholder

12  meetings?

13  A    No.

14  Q    Was Danny Turetsky at the bondholder meetings?

15  A    At that time, I think he did not admit to the meeting.  He

16  did not come, but he sent a lawyer from his side, a

17  representative.

18  Q    Okay.

19  A    He did not.  He was no in that meeting.  I think it was one

20  or two meetings he did not appear, but he voted.

21         THE COURT:  Mr. Bensinger, you've been going for quite

22  a while.  I just want to try to keep within the appropriate

23  context here, which is what you've actually argued in your

24  opposition.  You argued in your opposition that there is no

25  ongoing business in the country, and therefore that Israel can't

Guy Gissin - Cross (Bensinger)                    49

1   be the COMI.  Right?

2          MR. BENSINGER:  Correct.

3          THE COURT:  So you don't seem to have disputed the

4   fact that the liquidation proceedings are in fact being

5   conducted out of Israel by Mr. Gissin and his colleagues.

6          MR. BENSINGER:  Nor have I contested that in my

7   papers, Your Honor.

8          THE COURT:  Right.  So, I just want to try to keep

9   track of the scope and the relevant of all the questions that

10  you're asking Mr. Gissin.  In other words that since you've

11  taken the position that there are no ongoing operations and that

12  Israel can't be the COMI, one might observe that all of this is

13  irrelevant.  But I'm going to give you latitude, but I just want

14  to try to you know keep it focused on the scope of what you

15  actually argued, and to make sure that you're familiar with

16  Judge Bernstein's recent ruling in _Suntech_ which deals rather

17  precisely with at least one aspect of the COMI issue.

18         MR. BENSINGER:  Your Honor, I'm quite familiar with

19  Judge Bernstein's ruling in _Suntech_.  And in fact the scope of a

20  lot of these questions goes to address facts that were present

21  in that situation that are not present in ours.

22         THE COURT:  Okay.  All right.  Keep going.

23         MR. BENSINGER:  Thank you.

24  BY MR. BENSINGER:

25  Q    Do you know somebody named Edwin Cohen?

Guy Gissin - Cross (Bensinger)                    50

1  A    Yes, I do.

2  Q    Who is Edwin Cohen?

3  A    As far as I know -- I don't know him personally.  I know

4  who he is.  I met him once I think many years ago.  He is

5  shareholder in the company.  He was a shareholder in the company

6  that sold the controlling shares to Eliza Swedloff Company.  And

7  he is the owner of a company called Almont.  Him and another.

8  Not totally by himself, but he's one of the owners which holds

9  something like 25 percent -- sorry -- 50 percent of the bonds.

10 Q    Do you know somebody named Danny Turetsky?

11 A    Yes, I do.  He's Edwin Cohen's partner.  And he sold, as

12 director of the company until the sale of the shares to

13 Swedloff.

14 Q    Have you ever represented as an attorney, or whatever the

15 equivalent of an attorney is in Israel, either Mr. Cohen or

16 Turetsky?

17 A    No way.  Absolutely not.

18         MR. DEVORKIN:  Your Honor, I just want to be -- my

19 silence is not an acquiescent that this is relevant.  Because

20 we've argued that the conflict issue -- that, I think is where

21 we're going -- isn't germane.  But he's here to testify --

22         THE COURT:  Right.

23         MR. BENSINGER:  -- and I'm not going to try to

24 interrupt or disrupt.

25         THE COURT:  Well, the conflict issue, I think the

Guy Gissin - Cross (Bensinger)                           51

1   attempt is to tie that to § 1506.

2          MR. BENSINGER:  It is, Your Honor.

3          THE COURT:  But I would point out to you that it's

4   rather interesting because a lot of the theme of your arguments

5   is that granting recognition here would constitute this Court

6   playing into the scheme whereby these former shareholders played

7   fast and loose with the court in Israel and the New York Supreme

8   Court.  I would point out to you that there are liquidation

9   proceedings pending in Israel in which prior to the appointment

10  of Mr. Gissin and his colleagues your client had the opportunity

11  to go there and complain about the conflict and urge the Israel

12  court to not appoint them.  Your client did not do that.

13         So now what you're telling me is I should second-guess

14  the Israeli court's decision but that I shouldn't count and then

15  steer what you say is second-guessing the decisions of the

16  various state courts.  There's a little bit of a logical

17  inconsistency with your argument.  But I do take very seriously

18  the notion that when a party has had an opportunity to be heard

19  elsewhere in another court and that opportunity has come and

20  gone, I don't second-guess.  So I'm not going to cut off your

21  testimony -- your inquiry, but again, let's keep our eye on the

22  ball her.

23         MR. BENSINGER:  Your Honor, I understand that the

24  purpose of today's proceeding was to take testimony and not to

25  argue.  I feel like I should respond to that point made by the

Guy Gissin - Cross (Bensinger)                    52

1   Court though.

2           THE COURT:  Well, you don't have to.  You can do that

3   tomorrow.  But you know --

4           MR. BENSINGER:  I understand the Court's point.

5           THE COURT:  -- because the testimony is coming in, I

6   think the point made by counsel simply is that for the sake of

7   letting this go on and be concluded, he's not making relevance

8   objections.  So I think that was the point of the statement.

9           MR. DEVORKIN:  Yes, Your Honor.

10          THE COURT:  You're entitled to --

11          MR. DEVORKIN:  It would take more time to argue my

12  objections than just let him testify within reason.

13          THE COURT:  Right.  So let's just keep going.

14          MR. BENSINGER:  Thank you.

15          THE COURT:  Okay.  You can try to convince me tomorrow

16  that I'm wrong.  I don't think it would be appropriate to do it

17  any further in front of the witness.

18          MR. BENSINGER:  That's fine with me, Your Honor.

19  BY MR. BENSINGER:

20  Q   Do you know if Rami Kogan ever represented Mr. Cohen or Mr.

21  Turetsky as an attorney?

22  A   Yes, he did.

23  Q   Does he currently represent either Mr. Cohen or Mr.

24  Turetsky as an attorney?

25  A   No way.

Guy Gissin - Cross (Bensinger)                          53

1          MR. DEVORKIN:  I can't hear you.  Please don't go too

2    close.

3          THE WITNESS:  Okay.

4    A    He does not.

5    Q    Which of those two gentlemen, Mr. Cohen and Mr. Turetsky,

6    did Rami Kogan represent in the past?

7    A    I don't really know.  I think he represented Almont.  I

8    think, as far as I know.  Almont is the company under control of

9    both of them.

10   Q    Okay.  But you stated that he does not currently represent

11   Almond, nor --

12   A    Absolutely not.  And more than this it was clear and

13   directed and said out loud to the official receiver in Israel,

14   and at that meeting that I mentioned before of the bondholders

15   that Rami will not be involved in any way in conducting and

16   checking and investigating anything that is connected to Mr.

17   Turetsky or Mr. Cohen or Almont.  And even about Mr. Swedloff an

18   order because there could have been something said.  They sold

19   him the shares, etcetera.  He is not involved in it in any way.

20   Mr. Turetsky and I, through his lawyer, are having a lot of

21   correspondence and it is intense.  One of the reasons I need to

22   be in Israel is because I think, if I'm not mistaken, Sunday or

23   Monday, I'm going to investigate him.  It's clearly pure and

24   he's got no connection.  Rami Kogan does not have any

25   connections to the investigations or checking or whatever all

Guy Gissin - Cross (Bensinger)                    54

1  the claims that we might, that the liquidation might have

2  against him.

3  Q    Under Israel's conflict rules, would Rami Kogan be able to

4  bring an action against his former client?

5  A    Yes.  But he will not.  I will do it.  If needed of course.

6  There's no such decision yet, but if needed and if so decided it

7  will be signed and handled by me personally.  By my office only.

8  Q    Okay.  Are you familiar with the litigation that took place

9  in New York in 2012 between Sova Merritt LLC on the one side and

10 Abraham Poznanski and Wells Fargo on the other side in front of

11 Judge Schweitzer?

12 A    I heard about it, yeah.

13 Q    Did you represent -- I'm sorry; go on.

14 A    I heard about it.  I'm not familiar with all the details.

15 Q    Did you represent any of the parties directly or indirectly

16 in that litigation?

17 A    Absolutely not.

18 Q    Do you know if Mr. Kogan represented any of the parties

19 directly or indirectly in that litigation?

20 A    He might.  I don't know.  I think so.  He might have.  I

21 don't know.

22       MR. DEVORKIN:  Excuse me.  Can I clarify?  Did he

23 represent the parties that happen to be in that litigation or

24 was he representing the parties in that litigation?  I think the

25 question's unclear.

1          MR. BENSINGER:  I'm happy to clarify the question.

2          THE COURT:  Okay.  Let's ask it more precisely, okay?

3          MR. BENSINGER:  Sure.

4     BY MR. BENSINGER:

5     Q    To your knowledge, did Mr. Kogan give legal advice to any

6     party in the litigation of *Sova Merritt v. Poznanski and Wells*

7     *Fargo*?

8     A    I have no idea.

9     Q    To your knowledge at the time that that litigation was

10    occurring, did Mr. Kogan act as an attorney to any of the

11    parties in the *Sova Merritt v. Poznanski and Wells Fargo*

12    litigation?

13    A    I do not know that.  I don't have such information.  He

14    might.  I don't know.

15    Q    Okay.

16         MR. BENSINGER:  I have no further questions, Your

17    Honor.

18         MR. DEVORKIN:  I just have a couple.

19         THE COURT:  Any redirect?

20         MR. DEVORKIN:  Just a couple.

21         THE COURT:  Thank you, Mr. Bensinger.

22         MR. BENSINGER:  Thank you.

23                    REDIRECT EXAMINATION

24    BY MR. DEVORKIN:

25    Q    I have a couple of things.  The last point, just so we

Guy Gissin - Redirect (Devorkin)                    56

1    clarify.  Is it correct that with respect any claims that may

2    arise in the liquidation of SAL that concerned Turetsky, Cohen,

3    Almont or any of their interests, that Mr. Kogan has removed

4    himself from any decisions or activities with respect to those

5    claims?

6    A    Absolutely.  It was the demand of me and the demand of the

7    bondholders.  This was the demand that he will not be involved

8    in it and he did not want to be.

9    Q    Do you know whether the official -- just so we're clear.

10   Who is the official receiver?

11   A    The official receiver is an Israeli government authority

12   that escrows all the liquidators, temporary liquidators,

13   administrators, etcetera.  And we go to him to receive consent

14   for many things, and the escrows.  Anything we do usually.

15   Q    When you say escrows, I'm not sure what word you're using.

16   A    I use escrow because of my bad English maybe, but he

17   assists us.

18   Q    Okay.

19   A    He works with us and he gives us advice.  And on the other

20   end he goes to court and says if something is wrong or whatever.

21   Q    That person expresses his opinion to the court if he has

22   to.

23   A    Absolutely.  The court usually does not take any decision

24   without the opinion of the official receiver.

25   Q    And are you aware of whether the official receiver had any

Guy Gissin - Redirect (Devorkin)                    57

1   knowledge about prior litigation in which Mr. Kogan represented

2   Turetsky or Cohen, Almont?

3   A    Absolutely.  As I mentioned before, in 2013, there was the

4   first litigation request in Jerusalem.  And Mr. Kogan

5   represented Mr. Turetsky.  He represented Mr. Turetsky in Almont

6   at that point.

7   Q    And were they opposing or supporting --

8   A    They were in the courthouse.  Of course.

9   Q    Were they opposing or supporting that petition for

10  liquidation?

11  A    They were opposing.

12  Q    So was the official receiver involved in that 2013 attempt

13  to get liquidation?

14  A    Absolutely.

15  Q    Okay.  So let me just ask you since you're here and you're

16  leaving shortly.  What is the name of the official -- strike

17  that.  Is there a governmental agency in Israel that regulates

18  securities?

19  A    Absolutely.  It's the Israeli Securities Authority which is

20  the equivalent to SEC, the Security and Exchange Commission in

21  the United States.

22  Q    What's the acronym?

23  A    ISA, Israeli Securities Authority.

24  Q    And does the ISA have a website?

25  A    Yes, it does.  isa.gov.il.

Guy Gissin - Redirect (Devorkin)                    58

1  Q    And on that website does it publish any of the laws of

2  Israel governing public companies?

3  A    It does in English and in Hebrew.

4  Q    And is there something in Israel known as the company's

5  law, 5759-199?

6  A    Yes.

7         MR. DEVORKIN:  Can I mark this as -- I think Your

8  Honor could take judicial notice of this, but since I have a

9  copy, can I mark as Petitioner's 1?

10         THE COURT:  Okay.  If you're asking me to take

11  judicial notice of the laws of Israel -- is that what you're

12  asking me?

13         MR. DEVORKIN:  Well, I'm going to put an exhibit in

14  and I'm going to argue from it at some appropriate time.

15         THE COURT:  Okay.  Mr. Bensinger?

16         MR. BENSINGER:  Your Honor, objection.

17         THE COURT:  What's your objection?

18         MR. BENSINGER:  Objection as this Court can't take

19  judicial notice of the laws of the state of Israel.

20         THE COURT:  Okay.  You're right, Mr. Bensinger.  Well

21  done.  I can't take judicial notice of the laws of Israel.  You

22  can put them into evidence.

23         MR. DEVORKIN:  Well, that's what I'm attempting to do.

24         THE COURT:  Okay.  But you can't ask me to take

25  judicial of them.  You can through --

Guy Gissin - Redirect (Devorkin)                           59

1        MR. DEVORKIN:  So-warned.  I'm warned.

2        THE COURT:  You can give them to me and then give them

3   to Mr. Gissin and ask him about them.  And I think I, on my own,

4   since they're a body of law, can acquaint myself with them.

5        MR. DEVORKIN:  I'm going to mark this as -- what are

6   we up to?  I'm just going to mark this as Petitioner's --

7   perhaps it would be easier if we just continued the numbering

8   that we have now so there'll be less confusion.

9        THE COURT:  Why don't we change our convention and

10  call the exhibits that have been introduced today trial

11  exhibits.  So this will be Trial Exhibit 4 (sic).

12       MR. DEVORKIN:  Fine.

13       THE COURT:  How about that?  So the three that were

14  marked earlier --

15       MR. DEVORKIN:  So, we'll use common numbering.

16       THE COURT:  Common numbering.

17       MR. DEVORKIN:  Okay.

18       THE COURT:  Okay?

19       MR. BENSINGER:  We only marked two before.

20       THE COURT:  Well, I thought we marked the two original

21  declarations and then the reply declarations.

22       MR. BENSINGER:  Oh, I only entered the declaration of

23  Guy Gissin, the original declaration of Guy Gissin.

24       MR. DEVORKIN:  Well, you're right, Your Honor.  We

25  moved a lot of things in.

Guy Gissin - Redirect (Devorkin)                    60

1          THE COURT:  Wait, I'm sorry.  There --

2          MR. BENSINGER:  There's the declaration of Lawrence

3   Rosenstock and the objections of

4          THE COURT:  Right.

5          MR. BENSINGER:  Those two are moved in also

6          THE COURT:  So then I'm up to 5?

7          MR. DEVORKIN:  I suggest that I call it trial exhibit.

8   And that we'll sort out how many we have and we'll re-marked

9   this --

10         THE COURT:  Very good.

11         MR. DEVORKIN:  -- subsequent.

12         THE COURT:  This is one of the things that I wanted

13  you to have done before you came here today.  Okay.  So what are

14  you going to call this one?

15         MR. DEVORKIN:  I'm just going to --

16         THE COURT:  Trial Exhibit 1 for the time being.

17         (Trial Exhibit 6 marked for I.D.)

18         MR. DEVORKIN:  I've given a copy of this to the Court.

19         THE COURT:  Okay.

20         MR. DEVORKIN:  I will supply counsel with another

21  copy.

22  BY MR. DEVORKIN:

23  Q    What is Company's Law 57591999?

24  A    It's the new Israeli company code from 1999.  The number

25  5759 relates to the Hebrew counting years.

Guy Gissin - Redirect (Devorkin)                          61

1  Q    And is this published in English as well as Hebrew on the

2  ISA website?

3  A    It does.

4  Q    And is this a copy of that publication?

5  A    It is.

6  Q    And this copy accurately reflect Israeli Law with respect

7  to -- as stated in here with respect to the companies that are

8  described?

9  A    It is.  There were amendments I think from last year that

10 is not connected, but it's not relevant.  But this is what is

11 right now on the ISA, Israel Securities Authorities' site.

12         THE COURT:  Mr. Bensinger, did you have something?

13         MR. BENSINGER:  (Non-verbal response.)

14         THE COURT:  No?  Okay.

15         MR. DEVORKIN:  Your Honor, this is admittedly beyond

16 the scope of Mr. Bensinger's examination.  But I'm going to ask

17 some questions.  If he's going to object on that ground, I

18 concede that.  But since Mr. Gissin is here, I thought I would

19 ask him a couple of questions about this.  But I can also just

20 cite the sections I want to Your Honor later.

21         THE COURT:  Okay.  Mr. Bensinger?

22         MR. BENSINGER:  I'll object when I hear the questions

23 if I think it's appropriate.

24         MR. DEVORKIN:  All right.

25 Q    Mr. Gissin, in your petition -- I'm sorry.  In your

Guy Gissin - Redirect (Devorkin)                          62

1   affidavit, reply affidavit, there is an Exhibit 23 --

2            THE COURT:  Are we in the reply declaration?

3            MR. DEVORKIN:  Yes.

4   Q    -- which you describe as a document obtained during the

5   course of the investigation.  Do you see that document?

6   A    Yeah.  The Limited Liability Company Agreement of Sova

7   Merritt LLC.

8   Q    Yes.  And it purports to be -- your reply declaration says

9   that it was obtained under subpoena to one of the investors in

10  401 Church LLC.

11  A    That's right.

12  Q    And 401 Church LLC is the entity that owns the property in

13  Nashville, correct?

14  A    Correct.

15  Q    And this document purports to be signed for Sovereign

16  Assets LLC by Abraham Poznanski, Manager.  And also be Abraham

17  Poznanski.  Do you see that?

18  A    Yes, I do on page 4.

19  Q    And it purports to make Sovereign Assets LLC the sole

20  member of Sova Management LLC, correct?

21  A    That's what it does.

22            THE COURT:  Mr. Bensinger?

23            MR. BENSINGER:  Objection, Your Honor.  We are well

24  outside the scope now of my questions.

25            THE COURT:  We are well outside the scope.  I mean I

Guy Gissin - Redirect (Devorkin)                    63

1    think that the document is here.  It's been admitted to evidence

2    and I can read it.

3           MR. DEVORKIN:  Well, Your Honor, I'm going to move

4    into evidence this trial exhibit, which is Public Company's Law

5    5759.

6           THE COURT:  Okay.  No objection to that, correct?

7           MR. BENSINGER:  None, Your Honor.

8           THE COURT:  Okay.

9           (Trial Exhibit 6 in evidence.)

10   Q    How long have you been practicing law in Israel?

11   A    Since '91.

12   Q    And how long have you been serving as a liquidator in

13   Israel?

14   A    About ten years.

15   Q    And this isn't your first liquidation?

16   A    Absolutely not.

17   Q    And how many other liquidations have you had?

18   A    Ten or more.

19   Q    Are you familiar with the Company's Law that's in front of

20   you?

21   A    Yeah.  And I escrow companies in the capital markets in

22   Israel since I was a paralegal in '89.

23   Q    By "in escrow", you mean advise companies?

24   A    Advise.  Sorry.  Escrow doesn't sound good.  Okay.

25   Q    And in 2013, -- right now as you've done your

Guy Gissin - Redirect (Devorkin)                    64

1   investigation, do you know whether the asset that SAL owned

2   through subsidiaries in Connecticut had any net equity to SAL?

3   A    Yes, it does.

4   Q    In Connecticut?

5   A    In Connecticut.  Sorry.

6   Q    In Connecticut?

7   A    In Connecticut, I do not know.

8   Q    Okay.  And do you know whether there's a mortgage on that

9   property?

10  A    I know there's a mortgage and there's a service center.

11  Q    And has the servicer moved to foreclose on that?

12  A    He did.

13  Q    For failure to pay the payments on the mortgage?

14  A    Exactly.

15  Q    So would it be fair to say that except for claims that he

16  company, SAL, has against various people that the beneficial

17  ownership interest in the Nashville property and the beneficial

18  ownership interest in the Connecticut property were the

19  company's primary assets in 2013?

20  A    Absolutely.

21  Q    Would the transfer of control or beneficial ownership of

22  one of those two assets constitute an extraordinary transaction

23  under Israeli Law?

24  A    Absolutely.  Extraordinary transaction is described in

25  Chapter 1 of the Company's Law.  I can read it to you if you

Guy Gissin - Redirect (Devorkin)                    65

1   want.

2   Q    Do you have a specific section in mind?

3   A    Yeah.

4        MR. BENSINGER:  I would object to this line of

5   questioning.

6        THE COURT:  Basis?

7        MR. BENSINGER:  It's also outside of the scope of the

8   direct examination and it's not relevant.  The nature of the

9   assets is one thing, but whether transfers comply with Israeli

10  Law, there is no discussion about transfers in my cross.

11       THE COURT:  Well, I think that one of the problems --

12  I mean this is the problem that we have with the way that this

13  has unfolded, is that at least some of the objectors and I can't

14  recall whether it's yourself, one of the objections has to do

15  with the fact that the current owner of the Nashville property

16  isn't even a subsidiary.  So at issue in fact is this transfer.

17  It has been brought into -- an issue of this transfer has been

18  made an issue in this case.

19       And given that the objectors have objected to

20  recognition on § 109 grounds, right; that there's no property.

21  Under Barnett, there has to be property in the United States,

22  right?  So they're objecting that the interest in the indirect

23  subsidiaries don't count.  And if there's a cause of action,

24  then that counts.  So that, yes, it's outside the scope of your

25  cross examination, but it's squarely within the parameters of I

Guy Gissin - Redirect (Devorkin)                    66

1   think things that -- issues that people have put in issue.

2   Okay?  So, I don't think we're going to go too far afield here.

3         MR. DEVORKIN:  No.  And also I'd ask Your Honor for

4   some indulgence because Mr. Gissin is not going to be available

5   to testify after Mr. Poznanski testifies, which will --

6         THE COURT:  Well, is Mr. Poznanski testifying?

7         MR. BENSINGER:  I'll make that determination after the

8   hearing, Your Honor.

9         MR. DEVORKIN:  So he may testify.

10        THE COURT:  See that's the problem that we have now

11  because of the confused way in which we've been proceeding.  So

12  if you are holding open the possibility that those questions

13  might be asked of Posnanski, we don't what the scope -- (A), we

14  don't know if he's going to appear; (B) We don't know what he's

15  going to be asked.  So then I think it's appropriate to make the

16  record now and you can move to strike it from the record later

17  if you'd like.

18        I mean I don't know -- I'm not thrilled about the way

19  this has played out.  I pride myself in conducting things in a

20  very orderly fashion.  So, I'm just trying to do the best that I

21  can for all of you without prejudicing anybody's rights.

22        MR. BENSINGER:  Your Honor, we've already told Mr.

23  Devorkin that if Mr. Gissin needs to or wants to return to

24  Israel and continue his testimony via videos conference or

25  something else --

1      THE COURT:  But again, Mr. Bensinger, and I mean this

2   in the nicest possible way, I get to make those decisions.  I

3   get to decide whether somebody gets to testify by declaration or

4   by telephone or by video.  And it's important to me, as the

5   trier of fact, to have a witness sitting there so that I can

6   look at him or her.  So that's not okay with me.

7      MR. BENSINGER:  Okay.

8      THE COURT:  And had we planned this better, we would

9   have avoided this entire situation.  And again, I didn't ask for

10  anybody to testify.  I just asked what your plans were.  So, we

11  are where we are.  I think you ought to continue, make the

12  record, and then Mr. Bensinger, if it turns out that -- these

13  questions turn out to not be germane to anything you asked Mr.

14  Poznanski, or if you determine not to call him, we can strike it

15  from the record.

16     MR. BENSINGER:  Okay, Your Honor, is there any way we

17  can notate the record where we are, and that questions from this

18  point will be struck if we don't call Mr. Poznanski?

19     THE COURT:  The record will reflect this very

20  conversation that we're having --

21     MR. BENSINGER:  Okay.

22     THE COURT:  -- so we will know.

23     MR. BENSINGER:  Thank you, Your Honor.

24     THE COURT:  All right?  Thank you.

25  BY MR. DEVORKIN:

Guy Gissin - Redirect (Devorkin)                68

1  Q    First of all, have you done anything to examine the records

2  of SAL that existed before the liquidation began to ascertain

3  whether there were any board meetings of SAL in 2013 or any

4  other time to consider the subject of the document and the

5  transaction that's reflected in Exhibit 23?

6  A    Absolutely not.  There was no such meeting.

7  Q    The first question is did you do anything that --

8  A    I did a lot.

9  Q    And did you do anything to determine whether there were any

10 shareholder -- general shareholder meetings called with respect

11 to the subject matter of the transaction that's purported to be

12 reflected in that Exhibit 23?

13 A    Absolutely.  There were none.

14 Q    You investigated and there were none?

15 A    Investigated and any call for a meeting of a public company

16 in Israel should be published on the ISEA website.

17 Q    And what is ISEA?

18 A    ISA, I'm sorry.

19 Q    All right.

20 A    Israel Securities Authority.

21 Q    All right.

22 A    And there were none of those.

23 Q    Okay.  Is there any provision of this trial exhibit,

24 Company's Law 5759 which addresses what authority the company

25 has to obtain to engage in a transaction with a director or with

Guy Gissin - Redirect (Devorkin)                    69

1   an officer?

2   A    Yes.

3   Q    Could you just direct the Court's attention to those

4   sections?

5   A    It starts as Section 268 at page 83.  The Chapter 5,

6   Transactions of Interested Parties.  Start at the bottom of page

7   82, and Section 268 is at page 83.  And it goes until 283 if I'm

8   not mistaken -- 284.

9   Q    And what, if any, procedures have to be followed under

10  Company's Law 5759 for a public company to transfer a major

11  asset either to an officer or a director or to an entity

12  controlled by an officer or director?  Could you take us through

13  that?

14  A    Yes.  Any extraordinary deal/transaction that a company

15  does with an interested party, which includes directors,

16  shareholders of over five percent or whatever is subject to the

17  following.

18  Q    It would also include director?

19  A    Sure.  Absolutely.  A director and a shareholder and any

20  officer of the company as well.  It goes to Section 270, in

21  subsection 4.  It's on page 84.  It says that an extraordinary

22  transaction of a public company --

23           MR. DEVORKIN:  I'm sorry, Your Honor.  You don't have

24  a copy?

25           THE COURT:  I don't have a copy.

Guy Gissin - Redirect (Devorkin)                    70

1          MR. DEVORKIN:  I apologize.

2          THE COURT:  That's okay.  I'm listening, I just don't

3     have a copy.  No, you can keep it.

4          MR. DEVORKIN:  No, I don't need mine.

5          THE COURT:  Okay.

6          MR. DEVORKIN:  Let's let the Court catch up.

7          THE COURT:  Okay.

8     A    It's on page 84, subsection 4.  "An extraordinary

9     transaction of a public company with a holder of control

10    therein.  Or an extraordinary transaction a public company with

11    another person in which the holder of control is a person of

12    interest, including a private placement."  And then I jump over.

13    "As well as the conclusion of the contract by a public company

14    with a holder of control of it.  If such person is also an

15    office holder hereof, as to the conditions of his office and the

16    employment.  And if he is an employee of the company, but not an

17    officeholder thereof as to his employment.

18         And then these extraordinary transactions should be

19    approved according to Section 275 on page 85.  And it says as

20    follows:  "A transaction to which a provisions of Section 270,

21    subjection 4, which we just read, apply shall require the

22    approvals by those mentioned below in the following order.  The

23    audit committee, which means the committee of the board of

24    directors that consist only of unrelated directors, including

25    the two external directors, then the board of directors, and

Guy Gissin - Redirect (Devorkin)                          71

1  then the general meeting provided that one of the following

2  applies:

3       In the count of votes, the majority in the general meeting,

4  includes at least one-third."  By the way, it was updated and

5  now it's the majority of the unrelated should approve it.  It's

6  a change in the law from last year that does not reflect here.

7  "Of all the votes of those shareholders that do not have a

8  personal interest in the approval of the transaction who were

9  present in the meeting."

10      And when the company wants to approve such a deal, it has

11  to provide a full report of all natures and to show ISA demands;

12  and to have appraisals of such assets.  If you want to sell the

13  assets that the public company holds to another person, which is

14  connected, you need to show appraisals and to give time,

15  something like 35 days from the call of the meeting, after the

16  approval of the audit committee and the board of directors in

17  order to approve it this way.

18  Q    So you also have to report it to the ISA?

19  A    Absolutely.  And the ISA usually stops the running of the

20  time because she wants to check it, check the appraisals.

21  Usually it takes two or three months at least.

22  Q    Is there a provision in the Company's Law that you have

23  before you as to the validity of a transaction which does not

24  comply with the provisions of 275 or any other provisions that

25  might be applicable?

Guy Gissin - Redirect (Devorkin)                    72

1  A   Please see Section 280 on page 86, Invalid Transaction.

2  And says "A transaction of the company with an officeholder

3  (which means the director as well) thereof or an extraordinary

4  transaction by a public company with the holder of control

5  thereof should not be valid in respect of the company or the

6  officeholder or holder of control if the transaction is not

7  approved in accordance with the provisions of this chapter."

8  Which means 275 that we just read.  "Is not approved in

9  accordance with the provision of this chapter, or if a

10 substantial defect has occurred in that approval process or if

11 the transaction was affected in a way that deviated

12 substantially from the terms of the approval."

13 Q   Okay.  Now, in two thousand and -- let's take it a year --

14 2011, did SAL have a board of directors?

15 A   Sure.

16 Q   And it had how many members again?

17 A   Seven.,

18 Q   And three were elected by Mr. Poznanski?

19 A   No.  The election --

20 Q   Or nominated, I'm sorry.  Three were nominated by Mr.

21 Poznanski, correct?

22 A   The election is by the general meeting.  According to the

23 agreement, the shareholder's agreement that I know he had with

24 Almont, he had the right to ask to call for three of the

25 directors.

Guy Gissin - Redirect (Devorkin)                    73

1   Q    And Almont had the right to call for how many?

2   A    Two.

3   Q    And jointly they had the right to call for two external?

4   A    It's not right, you have to.

5   Q    Okay.

6   A    According to law.

7   Q    What are the duties of an external director in Israel?

8   A    External director should be one that is not connected to

9   the controlling shareholder or to the company in any way.  He

10  represents the public at the end of the day in the eyes of the

11  ISA.

12  Q    And is there a mechanism in Israel to remove or change

13  external directors?

14  A    Yes, there is.  It can be only once in three years at the

15  general meeting.  You cannot remove him during his period.  You

16  do not vote for him during the annual meetings.  Only once in

17  three years you can ask to nominate somebody else.

18  Q    So once external directors are appointed and serve, who

19  votes on whether new external directors should serve in their

20  place?

21  A    The only votes that are countable in an annual meeting that

22  the company asks to nominate external directors, is only the

23  unrelated parties -- shareholders.  Sorry.

24  Q    Okay.  Between 2011 and 2014 when the liquidation was

25  filed, do you know whether there were any changes in the members

Guy Gissin - Redirect (Devorkin)                    74

1  of the board of directors?

2  A    Not that I recall.

3  Q    And --

4  A    In the external director you mean?

5  Q    External director, yes.

6  A    Yes.  Because the other director, as I said before,

7  Turetsky resigned and then they sold the shares Swedloff.

8  Q    Okay.

9        MR. DEVORKIN:  I have nothing further, Your Honor.

10       THE COURT:  Can I -- before you sit down, can I ask

11 you a few questions, please?

12       THE WITNESS:  Sure.

13       THE COURT:  How is it that you and your firm are being

14 paid for the services you rendered in this proceeding?

15       THE WITNESS:  According to Israeli Law, the only

16 payment I can receive is by the decision of court, according to

17 regulations, specific regulations for payments.

18       THE COURT:  But if you -- let me ask the question a

19 different way.  If you don't recover any assets --

20       THE WITNESS:  Unfortunately, I waste my time.

21       THE COURT:  -- will you not get paid?

22       THE WITNESS:  Yeah.

23       THE COURT:  Yes?

24       THE WITNESS:  Nobody pays.  If you need --

25       THE COURT:  If you do not recover -- let me state it

Guy Gissin - Redirect (Devorkin)                    75

1    differently.  You will only be paid if you recover --

2              THE WITNESS:  Exactly.

3              THE COURT:  -- assets for the benefit of all the

4    creditors?

5              THE WITNESS:  Exactly.

6              THE COURT:  And then under Israeli Law, do you and

7    your firm receive a priority of payment?  In other words, you're

8    paid first, and then the creditors --

9              THE WITNESS:  Yes.

10             THE COURT:  -- would share according to a plan of

11   liquidation?

12             THE WITNESS:  It is called liquidation expenses.  We

13   are part of the liquidation expenses that comes before the

14   creditors.  But the sum is subject to what we can repay.

15             THE COURT:  Okay.  Thank you.

16                     CONT'D REDIRECT EXAMINATION

17   BY MR. DEVORKIN:

18   Q    You have to submit an application to the Court to show

19   receiver?

20   A    Yes, of course.

21   Q    And they have to approve it?

22   A    It will never been approved without the official receiver

23   telling the court what he thinks about it and that it suits

24   their regulations, unfortunately.

25             THE COURT:  Okay.  All right.

Sovereign Assets Ltd. And Guy Gissin - 12/3/14          76

1       MR. DEVORKIN:  I have nothing further.

2       THE COURT:  Anything further, Mr. Bensinger?

3       MR. BENSINGER:  Nothing further, Your Honor.

4       THE COURT:  All right.  Anyone else, any questions?

5       (No response.)

6       THE COURT:  Okay.  Mr. Gissin, thank you very much.

7   You're excused.  Okay.  So, I think that's all we agreed to do

8   today.  I'd like to have a little clarity around what we're

9   doing tomorrow.  Whether Mr. Poznanski is coming.  Is that to be

10  determined yet?

11      MR. BENSINGER:  Being determined as we sit here, Your

12  Honor.

13      THE COURT:  Pardon me?

14      MR. BENSINGER:  It's being determined as we sit here.

15      THE COURT:  It's being determined, but it hasn't yet

16  been determined.  When do you propose to let everyone else know

17  whether or not Mr. Poznanski will be joining us tomorrow?  I

18  think we need to have a little bit of a plan for tomorrow.

19      MR. BENSINGER:  I agree.  I can let everybody know

20  within I would say 20 minutes of us adjourning this hearing.

21      THE COURT:  Okay.  And he would be the only witness

22  that we're calling tomorrow, and then we would just have

23  argument on the petition and on the various objections.  Yes?

24      MR. DEVORKIN:  Yes.

25      MR. BENSINGER:  Correct, Your Honor.

Sovereign Assets Ltd. And Guy Gissin - 12/3/14          77

1          THE COURT:  Okay.

2          MR. DEVORKIN:  That's correct.

3          THE COURT:  All right.  Could I ask that when the

4   determination is made, you simply inform chambers as to whether

5   or not we'll be seeing Mr. Poznanski?  You can copy the other

6   parties.

7          MR. BENSINGER:  Certainly, Your Honor.

8          THE COURT:  All right?  Okay.  Thank you very much.

9   Thank you for rising to the challenge.

10          MR. CAVALIERE:  Your Honor, if I could just comment.

11   One quick --

12          THE COURT:  Yes.

13          MR. CAVALIERE:  It's a factual question.  But my

14   understanding is that Mr. Poznanski had a deposition back on

15   November 25 in connection with this matter.  Did that go

16   forward?

17          MR. DEVORKIN:  No.  He had a 2004 examination, not a

18   deposition on this matter.

19          MR. CAVALIERE:  Okay.  Just for the record, the 2004

20   examination, we had asked to monitor and we were denied that

21   right.  To the extent that there's a transcript associated with

22   that deposition, that's going to be relevant to tomorrow's

23   testimony.  We would like a copy of that transcript so we could

24   ascertain whether we want to ask Mr. Poznanski any questions as

25   well and be prepared to address that.  We asked for the

Sovereign Assets Ltd. And Guy Gissin - 12/3/14          78

1   transcripts and they were --

2            THE COURT:  Is there a transcript available yet?

3            MR. DEVORKIN:  There's a rough transcript.  My

4   position has been, Your Honor, that this is part of what's

5   called a trustee's investigation, which is a private

6   investigation.  It's confidential.  And it is not shared with

7   all interested parties in the proceeding in my experience.  I've

8   represented trustees for 30 years and I'm not saying it never

9   happens under special compelling circumstances, but the general

10  rule is that the trustee is entitled to investigate

11  confidentially without sharing on the entire record what he's

12  doing and what's learning.  And I would object to sharing that

13  transcript and having --

14           THE COURT:  Well, Mr. Bensinger has a copy, right?

15           MR. DEVORKIN:  No.

16           MR. BENSINGER:  Not yet.

17           MR. DEVORKIN:  He doesn't have a copy yet.

18           THE COURT:  But he was at the deposition?  You were at

19  the deposition, right?

20           MR. BENSINGER:  I was.  I will have a copy.

21           MR. DEVORKIN:  No, he will have a copy, but he's a

22  witness.  And the witness has a copy.

23           THE COURT:  Right.

24           MR. DEVORKIN:  But outside parties generally do not

25  have copies.  They don't generally attend.

Sovereign Assets Ltd. And Guy Gissin - 12/3/14          79

1          THE COURT:  Okay.

2          MR. DEVORKIN:  They don't look over the trustee's

3     shoulder.

4          THE COURT:  Look.  We're getting -- this is spinning

5     way out of control.  Okay?  And I am becoming increasingly

6     unhappy.  To the extent that you're going to put Poznanski on

7     the stand, and you're going to seek to impeach him with his 2004

8     testimony, then it's open season and the other parties would be

9     entitled to have the transcript so that they could do their own

10    impeach or impeach your impeachment.  So you have to make a

11    choice.

12          Now, Mr. Bensinger, if you're going to use it, I don't

13    know why you would use it, but if you're going to use it, I

14    suppose we would face a similar issue.  But I can't imagine

15    frankly that you're going to use it if you're going to bring him

16    in.

17          MR. BENSINGER:  I don't plan on it, Your Honor.

18          THE COURT:  So, it's your call.

19          MR. DEVORKIN:  I think it's premature.  We don't know

20    whether he's testifying.

21          THE COURT:  I understand.  If he's going to testify,

22    and if you're going to impeach him with something that he said

23    in his 2004 examination, you're going to have to make it

24    available to these folks.  We'll have to take a recess in order

25    for you to look at it.

Sovereign Assets Ltd. And Guy Gissin - 12/3/14        80

1    MR. DEVORKIN:  My view on that would be, Your Honor,

2   not to have to waste the Court's time tomorrow.  If Mr.

3   Bensinger informs us tonight that he's going to call Mr.

4   Poznanski as a witness, I will send counsel for the Nashville

5   Plaintiffs a digital copy of the rough tonight.

6        MR. CAVALIERE:  Thank you.

7        THE COURT:  Okay.  I mean to the extent that there's

8   anything in there that's truly confidential, and qualifies for

9   sealing, consistent with the provisions of the Bankruptcy Code,

10   I'll hear you on that.  But generally speaking, if you're going

11   to use it, it opens it all up.

12        MR. DEVORKIN:  Right.  But I would request if he does

13   not wind up testifying and it's not used --

14        THE COURT:  Then we'll cross --

15        MR. DEVORKIN:  -- that it be returned and it not be

16   disseminated beyond its use for this hearing yet.

17        THE COURT:  We'll cross that bridge when we come to

18   it.  We've got enough to deal with.

19        MR. DEVORKIN:  So that we understand --

20        THE COURT:  Yes.

21        MR. DEVORKIN:  -- until that happens, they're not

22   going to disseminate it and copy it.

23        THE COURT:  It's counsels' eyes only.

24        MR. CAVALIERE:  Absolutely, Your Honor.

25        MR. ROSENSTOCK:  Yes.

Sovereign Assets Ltd. And Guy Gissin - 12/3/14          81

1          THE COURT:  Okay.  It's counsels' eyes only for the

2     purposes of this proceeding only.  It's not to be used

3     consistent with the objection that was made last time during the

4     deposition.  It should not be used as an end-run around

5     proceedings consistent with the Federal Rules of Civil Procedure

6     or beyond what the state court might have ordered, etcetera,

7     etcetera.  Am I making sense?

8          MR. CAVALIERE:  Yes.

9          MR. ROSENSTOCK:  Absolutely.

10          MR. BENSINGER:  Absolutely.  Your Honor.

11          THE COURT:  Okay.

12          MR. BENSINGER:  Your Honor, one other small piece of

13     housekeeping.

14          THE COURT:  Yes.

15          MR. BENSINGER:  There's a 30-page document, Exhibit K,

16     to Mr. Poznanski's opposition, which is in Hebrew.  As I

17     indicated in the opposition, he was having it translated and the

18     translator took a bit longer than anticipated.  But I do now

19     have the translation, and I would just want to know would the

20     Court prefer that I overnight FedEx; bring it tomorrow; fax it,

21     email it in?

22          THE COURT:  Well, how are you proving up the validity

23     of the translation?

24          MR. BENSINGER:  Sure.  Well, all the documents that

25     have been put in in Hebrew that have been translated come with

Sovereign Assets Ltd. And Guy Gissin - 12/3/14          82

1    the translator certification.

2              THE COURT:  Yes.

3              MR. BENSINGER:  There's one with this as well.

4              THE COURT:  There's one?  Okay.

5              MR. BENSINGER:  Yeah.

6              MR. DEVORKIN:  That's fine.  I would just like him to

7    email it to me tonight.

8              MR. BENSINGER:  Oh, I'll send it to all parties, of

9    course.

10             THE COURT:  Okay.  Fine.

11             MR. BENSINGER:  I just want to know how to get it to

12   the Court.

13             THE COURT:  That's fine.  You can either -- you can

14   PDF it to us, and bring a hard copy.  That's fine.

15             MR. BENSINGER:  Okay.

16             THE COURT:  But it will have a certification similar

17   to the other documents?

18             MR. BENSINGER:  Yes.  This could be the dispositive

19   exhibit, Your Honor.

20             THE COURT:  I wish I could say that I read Hebrew, but

21   unfortunately I didn't get to go to Hebrew school.  So I don't.

22             MR. BENSINGER:  Okay.  Thank you very much, Your

23   Honor.

24             MR. DEVORKIN:  Thank you, Your Honor.

25             THE COURT:  Anything else?

Sovereign Assets Ltd. And Guy Gissin - 12/3/14        83

1              (No response.)

2              THE COURT:  All right.  Safe travels back to Israel.

3    Thank you very much.

4              MR. GISSIN:  Thank you so much.

5              THE COURT:  One o'clock tomorrow.

6              ALL COUNSEL:  Thank you, Your Honor.

7              THE COURT:  Right?  One o'clock tomorrow.

8              (Pause.)

9              MR. DEVORKIN:  Oh, Your Honor, I think we should be

10   back on the record.

11             THE COURT:  Hold on, folks.

12             MR. DEVORKIN:  I just request that Your Honor continue

13   the restraining order until tomorrow.

14             THE COURT:  Okay.  Are we back on the record now?

15             COURTROOM DEPUTY:  Yes.

16             MR. BENSINGER:  I think we agreed it would be on till

17   Thursday.  I think we did agree.  Or we can continue it to

18   tomorrow.

19             MR. ROSENSTOCK:  Well, we have a consent order that

20   was signed.

21             THE COURT:  I would like the restraining order to

22   continue until I can give you a ruling, which --

23             MR. DEVORKIN:  That's fine with me.

24             THE COURT:  I don't know when.

25             MR. DEVORKIN:  And I'd request that, but I'm just

Sovereign Assets Ltd. And Guy Gissin - 12/3/14          84

1   requesting for the moment until tomorrow.

2          THE COURT:  I may be in a position to do that

3   tomorrow; I may not.  I just don't -- I don't know.

4          MR. DEVORKIN:  Well, I was going to make that

5   application at the end of the hearing.

6          THE COURT:  Okay.

7          MR. DEVORKIN:  But I'm just taking things one step at

8   a time.

9          THE COURT:  But at least we have to get it until

10  tomorrow.

11         MR. ROSENSTOCK:  We agreed for tomorrow, Your Honor.

12  Everybody had agreed till --

13         THE COURT:  Had agreed till tomorrow.

14         MR. ROSENSTOCK:  Right.

15         MR. DEVORKIN:  Right.  But it's not on the record.

16  That's why I'm putting it on the record.

17         THE COURT:  Okay.  But let us remember that in the

18  event that I'm not in the position to give you a ruling tomorrow

19  I would expect that the parties would agree that it continue

20  until there is a ruling.  All right?  Okay.  Thank you.

21                          - o0o -

22

23

24

25

85

CERTIFICATION

     I, Rochelle V. Grant, certify that the foregoing is a

correct transcript from the official electronic sound recording

of the proceedings in the above-entitled matter.

Dated:  August 27, 2015

_____
Signature of Approved Transcriber

```
                        I N D E X                              86
```

| Witnesses | Direct | Cross | Redirect | Re-Cross |
|---|---|---|---|---|
| Guy Gissin | | | | |
| By Mr. Bensinger | | 25 | | |
| By Mr. Devorkin | | | 55/75 | |

```
                      E X H I B I T S
```

| Nos | Description | Marked | Admit |
|---|---|---|---|
| T-1 | Guy Gissin's declaration | | 23 |
| T-2 | Rami Kogan's declaration | | 23 |
| T-3 | Guy Gissin's reply declaration | | 23 |
| T-4 | Abraham Poznanski's declaration | | 24 |
| T-5 | Nashville declaration | | 25 |
| T-6 | Israeli Public Company's Law 5759 | 60 | 63 |